

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**ZINA DANIEL WIFE OF/AND
OFFICER ABREACE L. DANIEL,
INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATES OF THE MINORS,
KRISTOFFER DANIEL, BRANDEN DANIEL
AND JARDYN DANIEL**

**VERSUS**

**EDWIN P. COMPASS, III, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS
SUPERINTENDENT OF THE NEW ORLEANS
POLICE DEPARTMENT, LIEUTENANT DAVID
BENELLI, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS COMMANDER OF
THE NEW ORLEANS POLICE DEPARTMENT
SEX CRIMES UNIT, SERGEANT MICHAEL J.
BOSSETTA, SR., INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS A SERGEANT WITH
THE NEW ORLEANS POLICE DEPARTMENT
SEX CRIMES UNIT AND THE CITY OF NEW
ORLEANS**

**CIVIL ACTION NO.**

# 04-2034

**SECTION SECT. S MAG. 4**

**MAGISTRATE 5**

**JURY TRIAL REQUESTED**

### COMPLAINT FOR DAMAGES PURSUANT TO 42 USC SECTION 1983 AND PENDANT STATE CLAIMS PURSUANT TO LA. C.C. ARTICLES 2315 AND 2315.6

**THE COMPLAINT** of Zina Daniel (**Mrs. Daniel**) wife of/and Officer Abreace L.

Daniel (**Officer Daniel**) individually and as Administrator of the estates of the minors, Kristoffer

Daniel (**Kristoffer**), Branden Daniel (**Branden**) and Jardyn Daniel (**Jardyn**) respectfully avers

as follows:

Fee $150.00
X Process
Dktd
CtRmDep
Doc. No.

## I

Made defendants herein are:

(a)     Edwin P. Compass, III **(Superintendent Compass)** individually and in his official capacity as Superintendent of the New Orleans Police Department who, on information and belief, is a person of the full age of majority domiciled in New Orleans, Louisiana;

(b)     Lieutenant David Benelli **(Lt. Benelli)** individually and in his official capacity as Commander of the New Orleans Police Department Sex Crimes Unit who, on information and belief, is a person of the full age of majority domiciled in New Orleans, Louisiana;

(c)     Sergeant Michael J. Bossetta, Sr. **(Sgt. Bossetta)** individually and in his official capacity as a Sergeant with the New Orleans Police Department Sex Crimes Unit who, on information and belief, is a person of the full age of majority domiciled in New Orleans, Louisiana;

(d)     The City of New Orleans **(the City)**, a body politic and corporate by that name with the capacity to sue and be sued in this court.

## II

At all times hereto Superintendent Compass was the superintendent of the New Orleans Police Department **(NOPD)** and was acting within the source and scope of his employment in that position. Further, as Superintendent of the New Orleans Police Department he was an employee of the City and, at all times pertinent to this litigation, functioned in the course and scope of that employment.

## III

At all times pertinent hereto Lt. Benelli was a Lieutenant in the NOPD and Commander of its Sex Crimes Unit. At all times pertinent to this litigation Lt. Benelli acted in the course and scope of that employment. As a Lieutenant in NOPD he was also an employee of the City and at all times pertinent hereto was acting in the course and scope of that employment as well.

2

**IV**

At all times pertinent hereto Sgt. Bossetta was a Sergeant in the NOPD assigned to its Sex Crimes Unit. At all times pertinent to this litigation Sgt. Bossetta was acting in the course and scope of that employment. As a Sergeant in the NOPD acting in the course and scope of that employment he was also an employee of the City and, at all times pertinent hereto was acting in the course and scope of that employment.

**V**

At all times pertinent hereto the City was the employer of Superintendent Compass, Lt. Benelli and Sgt. Bossetta and each of those individuals was acting within the course and scope of their employment at all times set forth in this Complaint.

**VI**

Virtually all of the pertinent events referred to in this Complaint occurred within the Eastern District of Louisiana and accordingly venue is proper in this court.

**FIRST CAUSE OF ACTION**

**VII**

Jurisdiction for Mrs. and Officer Daniel (in his individual capacity and representative capacities). First Cause of Action is based upon 42 USC § 1983.

**VIII**

On July 22, 2003 Sgt. Bossetta prepared an Application for Arrest Warrant (**the Application**) bearing NOPD Item I-20420-00 for Officer Daniel's arrest for an aggravated rape/attempt murder/aggravated battery/second degree kidnapping that occurred on or about September 12, 2000 in the early morning hours at or near 2639 Bartholomew Street in the Florida Housing Projects in New Orleans, Louisiana.

## IX

The Application was in the form of a sworn Affidavit executed by Sgt. Bossetta on July 22, 2003.

## X

A copy of the Application prepared by Sgt. Bossetta is attached to this Complaint as Exhibit "1."

## XI

On information and belief the Application resulted in an Arrest Warrant being signed by Commissioner Harry Cantrelle of the Orleans Parish Magistrate Court on July 22, 2003.

## XII

On July 23, 2003 an Order of Search (**the Order**) was issued for various items relating to Officer Daniel's arrest including, but not limited to khaki pants, chemical mace or pepper spray, a police expandable baton commonly known as an ASP, seriologic/forensic secretions for DNA profiling and a 1999 Pontiac Firebird automobile.

## XIII

A copy of the Order bearing Item No. I-20420-00 in its unsigned state is attached as Exhibit "2." On information and belief the Order of Search was signed by a Commissioner of the Orleans Parish Criminal District Court and executed against Officer Daniel, his residence and environs.

## XIV

On July 23, 2003 Officer Daniel was arrested by Sgt. Bossetta and Sgt. Joseph Lorenzo (**Sgt. Lorenzo**) of the NOPD on charges related to the aggravated rape referred to above

occurring on or about September 12, 2000 at or near 2639 Bartholomew Street in New Orleans, Louisiana.

## XV

A copy of the Arrest Warrant Return indicating Officer Daniel's arrest on July 23, 2003 is attached as Exhibit "3."

## XVI

The Rights of an Arrestee or Suspect bearing No. 235652 executed by Officer Daniel on July 23, 2003 at 7:43 a.m. indicating that Officer Daniel was arrested for aggravated rape/attempted murder is attached as Exhibit "4."

## XVII

The Arrest Register of the Orleans Parish Criminal Sheriff relating to Officer Daniel's arrest on July 23, 2003 indicates charges of aggravated rape, attempted first degree murder, aggravated kidnapping and aggravated battery. A copy of the Arrest Register is attached as Exhibit "5."

## XVIII

On July 23, 2003 Superintendent Compass issued a news release indicating that Officer Daniel was "taken into custody by agents from the Public Integrity Bureau and later booked at Central Lockup with aggravated rape, attempted murder, aggravated battery and second degree kidnapping."

## XIX

A copy of the NOPD new release dated July 23, 2003 is attached as Exhibit "6."

## XX

The Application by Sgt. Bossetta was so utterly lacking in probable cause that no reasonably well trained police officer would have requested its issuance. The lack of probable cause set forth in the Application is so obvious/severe that it would be almost laughable were its consequences not so severe/tragic.

## XXI

On information and belief Lt. Benelli was required to approve and either overtly or tacitly approved the Application signed by Sgt. Bossetta.

## XXII

On information and belief the policies and procedures of the NOPD required Superintendent Compass to specifically approve the arrest of an active duty member of his department. On information and belief Superintendent Compass specifically approved Sgt. Bossetta's Application.

## XXIII

On information and belief at least two ranking officers of the NOPD were opposed to the issuance of an Arrest Warrant for Officer Daniel believing that the "evidence" obtained by Sgt. Bossetta failed to justify an arrest.

## XXIV

Subsequent to Officer Daniel's arrest a preliminary examination was held in Orleans Parish Criminal District Court.

### XXV

On information and belief Sgt. Bossetta's testimony at the preliminary examination both contradicted the information contained in the Application in pertinent respects, and likewise failed to establish probable cause for Officer Daniel's arrest.

### XXVI

Officer Daniel's preliminary examination resulted in a conditional finding of probable pending the results of DNA testing of "evidence" and the swabs obtained from Officer Daniel pursuant to the Search Warrant.

### XXVII

On information and belief the results of the DNA testing were held back for a significant period of time due to their exclusion of Officer Daniel as a "suspect" in the crime for which he was arrested.

### XXVIII

As a result of the preliminary exam/DNA testing all charges against Officer Daniel were refused by the Orleans Parish District Attorney's Office.

### XXIX

Unfortunately, from the time of Officer Daniel's arrest/issuance of the press release through the refusal of charges against him, Officer Daniel was the subject of a tremendous amount of negative publicity, which was especially egregious due to his prior wrongful arrest/acquittal at trial on a sex crime related charge.

**XXX**

A synopsis of the problems encountered by Officer Daniel as a result of his arrest are detailed in an October 14, 2003 front page news story in the New Orleans Times Picayune, a copy of which is attached as Exhibit "7."

**XXXI**

On July 7, 2004 the NOPD issued a letter signed by Assistant Superintendent Lonnie H. Swain (**Asst. Superintendent Swain**) of the Public Integrity Bureau of the NOPD indicating the charges of misconduct against Officer Daniel were **not sustained,** from an Administrative standpoint. A copy of Asst. Superintendent Swain's July 7, 2004 letter is attached as Exhibit "8."

**XXXII**

Sgt. Bossetta's request for the issuance of an Arrest Warrant for Officer Daniel was based on actual malice, for reasons yet to be determined, and as noted above, was so totally devoid of probable cause that no reasonable police officer would have requested it. Further, the procedures utilized for identification of Officer Daniel by the "victim" of the crime in question were violative of NOPD policy and are not accurately set forth in the Warrant. These violations of policy and inaccuracies are further indications of the lack of probable cause for Officer Daniel's arrest.

**XXXIII**

Officer Daniel's right to be free from unconstitutional arrest was clearly established at the time he was taken into custody. *E.g., Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed. 2d 271 (1986); *Illinois v. Gates,* 462 U.S. 213, 76 L.Ed. 2d 527, 103 S.Ct. 2315 (1983).

## XXXIV

Further, Superintendent Compass, Lt. Benelli and Sgt. Bossetta may not assert a qualified immunity defense in this matter because: (1) Mr. and Mrs. Daniel's Complaint asserts the violation of a Constitutional right, *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed. 2d 277 (1991); (2) the Constitutional right in question was clearly established at the time of Superintendent Compass, Lt. Benelli and Sgt. Bossetta's actions, *Siegert, supra, Harrow v. Fitzgerald,* 447 U.S. 800, 102 S.Ct. 2727, 73 L.Ed. 2d 396 (1982) and (3) Superintendent Compass, Lt. Benelli and Sgt. Bossetta's actions were not objectively reasonable measured by clearly established law. *Harrow, supra,* at 457 U.S. 818, 102 S.Ct. 2739, *Brown v. Bryan County, Okl.,* 67 F.3d 1174, 1181 (1995) at p. 1181.

## XXXV

Sgt. Bossetta's inadequate training and experience to perform his duties as a sex crimes investigator with the NOPD, and Lt. Benelli and Superintendent Compass' approval of the Application are indicative of a policy of deliberate indifference to citizens' civil rights by the NOPD resulting in the deprivation of Mr. Daniel's civil rights as well as those of others living in New Orleans. Accordingly, Superintendent Compass is liable to Mr. and Mrs. Daniel pursuant to the *Monell Doctrine - Monell v. New York City Department of Social Servs.,* 436 U.S. 658, 56 L.Ed. 2d 611, 98 S.Ct. 2018 (1978).

## XXXVI

The incidents referred to in this Complaint received, as noted above, a great deal of coverage in the press. Officer Daniel suffered extreme humiliation and embarrassment as a result of the baseless charges brought against him.

## XXXVII

As a result of the incidents referred to above Officer Daniel (in his individual and representative capacity) and Mrs. Daniel are entitled to compensatory damages in the amount of One Million and no/100 ($1,000,000.00) Dollars.

## XXXVIII

As a result of the incidents referred to above Officer Daniel (in his individual and representative capacity) and Mrs. Daniel are entitled to punitive/exemplary damages in the amount of Seven Hundred Fifty Thousand and no/100 ($750,000.00) Dollars.

## XXXIX

As a result of the incidents referred to above Officer Daniel (in his individual and representative capacity) and Mrs. Daniel are entitled to payment of all attorney's fees and costs incurred by them in the prosecution of this action from Superintendent Compass, Lt. Benelli and Sgt. Bossetta.

## SECOND CAUSE OF ACTION

### XL

Officer Daniel (in his individual and representative capacity) and Mrs. Daniel re-allege and re-aver in singular and full each and every allegation raised by them in their First Cause of Action.

### XLI

Jurisdiction for Officer Daniel (in his individual and representative capacity) and Mrs. Daniel's Second Cause of Action is based upon La. C.C. arts. 2315 and 2315.6.

**XLII**

As a result of the incidents referred to above Officer Daniel was falsely arrested and maliciously prosecuted and defamed by Superintendent Compass, Lt. Benelli and Sgt. Bossetta, contrary to La. C.C. art. 2315.

**XLIII**

Additionally, as a result of the incidents referred to above Officer Daniel was subject to intentional or, alternatively, negligent infliction of emotional distress by Superintendent Compass, Lt. Benelli and Sgt. Bossetta, contrary to La. C.C. art. 2315.

**XLIV**

As a result of the incidents referred to above Mrs. Daniel, Kristoffer, Branden and Jardyn had to undergo the trauma of Officer Daniel's arrest and accordingly they are entitled to a separate award of damages for the torts committed against Officer Daniel pursuant to La. C.C. art. 2315.6.

**XLV**

At all times pertinent hereto Superintendent Compass, Lt. Benelli and Sgt. Bossetta were in the course and scope of their employment with the City as the NOPD does not exist as a separate entity.  Accordingly, the City is liable to Complainants pursuant to the doctrine of *respondeat superior* and other applicable legal doctrines.

**XLVI**

As a result of the incidents referred to Officer Daniel (in his individual and representative capacity) and Mrs. Daniel are entitled to compensatory damages in the amount of One Million and No/100 ($1,000,000.00) Dollars.

## XLVII

Officer Daniel (in his individual and representative capacity) and Mrs. Daniel are entitled to and expressly request a trial by jury on all issues set forth in both their First and Second Causes of Action herein.

**WHEREFORE,** Complainants Abreace Daniel, individually and as Administrator of the estates of the minors, Kristoffer Daniel, Branden Daniel and Jardyn Daniel, and Zina Daniel pray that Edwin P. Compass, III, individually and in his official capacity as Superintendent of the New Orleans Police Department, David Benelli, individually and in his official capacity as Commander of the New Orleans Police Department Sex Crimes Unit, Sgt. Michael J. Bossetta, Sr., individually and in his official capacity as a Sergeant with the New Orleans Police Department Sex Crimes Unit and the City of New Orleans be duly cited to appear herein in their individual and official capacities and answer this Complaint and after due proceedings had there be judgment herein in favor of Complainants and against all Defendants in the full and true sum of One Million Seven Hundred Fifty Thousand and No/100 ($1,750,000.00) Dollars, together with all attorney's fees and court costs incurred, together with legal interest from the date of judicial demand until paid and for all costs of these proceedings. Complainants further pray for all general and equitable relief to which they may be entitled.

Respectfully submitted:

**ROBERT C. STERN, L.L.C.**

Robert C. Stern (#12454)
Texaco Center
400 Poydras Street, Suite 1710
New Orleans, Louisiana  70130
Telephone:  504/525-8111

12

and

Willard Hill (#6917)
821 Baronne Street
New Orleans, Louisiana 70113

*Attorneys for Complainants, Zina Daniel wife of/and Officer Abreace L. Daniel, individually and as Administrator of the Estates of the Minors, Kristoffer Daniel, Branden Daniel and Jardyn Daniel*

**PLEASE SERVE:**

Edwin P. Compass, III
Superintendent
New Orleans Police Department
715 S. Broad Street
New Orleans, Louisiana 70119

Lt. David Benelli
Commander Sex Crimes Unit
New Orleans Police Department
715 S. Broad Street
New Orleans, Louisiana 70119

Sgt. Michael J. Bossetta, Sr.
New Orleans Police Department
Sex Crimes Unit
715 S. Broad Street
New Orleans, Louisiana 70119

City of New Orleans
through New Orleans City Attorney
Sherry Landry
5E03 City Hall
1300 Perdido Street
New Orleans, Louisiana 70112

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ZINA DANIEL WIFE OF/AND OFFICER ABREACE L. DANIEL, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATES OF THE MINORS, KRISTOFFER DANIEL, BRANDEN DANIEL AND JARDYN DANIEL** | **CIVIL ACTION NO.** |
| | **SECTION** |
| **VERSUS** | |
| **EDWIN P. COMPASS, III, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW ORLEANS POLICE DEPARTMENT, LIEUTENANT DAVID BENELLI, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS COMMANDER OF THE NEW ORLEANS POLICE DEPARTMENT SEX CRIMES UNIT, SERGEANT MICHAEL J. BOSSETTA, SR., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A SERGEANT WITH THE NEW ORLEANS POLICE DEPARTMENT SEX CRIMES UNIT AND THE CITY OF NEW ORLEANS** | **MAGISTRATE 5**<br><br>**JURY TRIAL REQUESTED** |

## VERIFICATION

**BEFORE ME,** the undersigned authority, personally came and appeared

### ABREACE L. DANIEL

who, after being duly sworn did depose and saw as follows:

That he has read the above Complaint for Damages pursuant to 42 USC § 1983 with pendant State claims pursuant to La. C.C. arts. 2315 and 2315.6 and that all of the facts contained therein are true and correct to the best of his knowledge, information and belief.

New Orleans, Louisiana this 20 day of _____July_____, 2004.

_____
**ABREACE L. DANIEL, Affiant**


Sworn to and subscribed before me this

20 day of _____July_____, 2004


_____
**NOTARY PUBLIC**

2

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ZINA DANIEL WIFE OF/AND OFFICER ABREACE L. DANIEL, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATES OF THE MINORS, KRISTOFFER DANIEL, BRANDEN DANIEL AND JARDYN DANIEL** | **CIVIL ACTION NO.** |

**SECTION**

**VERSUS**

**EDWIN P. COMPASS, III, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW ORLEANS POLICE DEPARTMENT, LIEUTENANT DAVID BENELLI, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS COMMANDER OF THE NEW ORLEANS POLICE DEPARTMENT SEX CRIMES UNIT, SERGEANT MICHAEL J. BOSSETTA, SR., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A SERGEANT WITH THE NEW ORLEANS POLICE DEPARTMENT SEX CRIMES UNIT AND THE CITY OF NEW ORLEANS**

**MAGISTRATE 5**

**JURY TRIAL REQUESTED**

## VERIFICATION

**BEFORE ME,** the undersigned authority, personally came and appeared

## ZINA DANIEL

who, after being duly sworn did depose and saw as follows:

That she has read the above Complaint for Damages pursuant to 42 USC § 1983 with pendant State claims pursuant to La. C.C. arts. 2315 and 2315.6 and that all of the facts contained therein are true and correct to the best of her knowledge, information and belief.

New Orleans, Louisiana this 20th day of _____ July _____, 2004.


_____
**ZINA DANIEL, Affiant**


Sworn to and subscribed before me this

20th day of _____ July _____, 2004


_____
**NOTARY PUBLIC**

2

PARISH OF ORLEANS        \*        APPLICATION FOR

STATE OF LOUISIANA        \*        ARREST WARRANT

                            \*        N.O.P.D. ITEM # I-20420-00

BEFORE ME, THE UNDERSIGNED JUDGE OF <u>CDC/ MAGISTRATE</u> COURT,

PARISH OF ORLEANS, STATE OF LOUISIANA, PERSONALLY CAME AND APPEARED:

Sergeant <u>Michael J. Bossetta , Sr., badge 274 NOPD Sex Crimes Unit,</u> EMPLOYED BY THE NEW

ORLEANS POLICE DEPARTMENT, 715 S. BROAD STREET, NEW ORLEANS, LOUISIANA

WHO, AFTER FIRST BEING DULY SWORN BY ME, DEPOSED AND STATED THAT A

WARRANT OF ARREST SHOULD BE ISSUED ORDERING THE ARREST OF:

Daniel, Abreace; black male, 9-162-65, SSN 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, WHO , ON THE 12th<sup>th</sup> DAY OF

September , 2000, IN THE PARISH OF ORLEANS, STATE OF LOUISIANA, DID COMMIT

THE CRIME OF Aggravated Rape/Attempted Murder/ Aggravted Battery/ and second degree

Kidnapping , AS DEFINED IN THE LOUISIANA REVISED STATUTES 14-42, 14-44, 14-34, 14-

27-30 THE FACTS AND CIRCUMSTANCES GIVEN TO SUPPORT THE ISSUANCE OF THIS
WARRANT ARE:

      In May 2003, Sergeant Michael Bossetta of the New Orleans Police Department Sex Crimes Section was working the Co Case overtime grant. Sergeant Bossetta had reviewed the case which was documented under NOPD Item # I-20420-00 and was an Aggravated Rape and Attempt Murder, which had occurred September 12th, 2000 in the dawn hours at 2639 Bartholomew Street in the Florida Housing project.

      The case involved a wanted subject that was described as a black male, 6'2" muscular build, in his mid 30's, with a close to bald head, cut like a football player, with a manicure, and wearing a black "polo" shirt with white jeans, with a balding head driving a white Pontiac Bonneville with unknown tag numbers. The victim was beaten and raped and left for dead in an abandoned strip of the Florida Housing development. Sergeant Bossetta was on the original scene.

      Sergeant Bossetta had conducted much of the follow-up to no avail, and had since assigned the case to Det. McCleery to re-investigate same. Sergeant Bossetta received a supplemental report from Det. McCleery under the September 2000 Item number and was reviewing same. In the narrative, Det McCleery stated that on May 21st, 2003, a New Orleans Police Officer, later learned to be Officer Ronald White of the citywide task force, had come to the sex crimes office with information on the case.

PLAINTIFF'S
EXHIBIT
1

A 105 (inter-office) was generated by Det. Joe Goines documenting the officer's information that was a La Lic Number of the possible white Bonneville being operated by a black male with a balding head. Officer White stated he ran the information and then made a pass at the location of the registered owner. According to the officer he wanted to view the composite sketch to confirm if the subject he observed was the same individual.
The 105 was forwarded to Det. McCleery and made addendum to the supplemental report.

Sgt. Bossetta found the circumstances of the officer's information and inquiry odd in that the case was three years old and no new information had been disseminated since that time. Sgt. Bossetta met with Lt. David M. Benelli, Commander of the Sex Crimes Unit, who concurred that because of the amount of time which had elapsed it had "peaked the interest" of the supervisors. Additionally, the supervisors were puzzled as to how this officer knew that this case was still open/active after such a long period of time. What was of most concern was that while the officer was at the Sex Crimes office looking at the posted composites, he asked for that specific one from the September 2000 case. Sergeant Bossetta had earlier removed this particular composite and made copies of same to furnish Detective McCleery for his investigation.

Lt. Benelli & Sgt. Bossetta contacted Officer White and had him come to the Rape office on Thursday, June 19th, 2003 for the purpose of an interview. On or about 2:30 p/m., Officer White arrived in the office and Lt. Benelli and Sgt. Bossetta related their concerns and puzzlement. Officer White stated that he was working his detail the night before he came up to the office in May. The detail was at the Cafe Roma located at Bienville & Jeff Davis Streets. Sometime that evening, Officer White stated he observed a white Pontiac Bonneville La lic # IFN036 pass the location with a black male with a baldhead driving. Officer White stated he just happened to remember a rape case from when he was assigned to the First District with a similar description and decided to copy the information. Officer White stated he came up to the rape office to turn over the information and view the composite to see if the person he saw was similar to the composite drawing.

Lt. Benelli and Sergeant Bossetta asked some further questions and stated that the scenario given was not very plausible considering the time factor and asked that officer if there was more information he knew and may be withholding. The officer became very defensive, and accused the supervisor's of investigating him  Sergeant Bossetta clearly informed Officer White that he was NOT a suspect nor had he been given his rights. Sergeant Bossetta asked Officer White that if he was so eager to co-operate and "just trying to help out" why was his demeanor so evasive and argumentative?  Officer White then began to badger Sergeant Bossetta about its YOUR job to investigate and became so belligerent Sergeant Bossetta exited the interview.   Shortly, after the officer left, Sergeant Barry Marquise called Lt. Benelli to inquire what the officer's visit was about.

**Detective Gonzales overheard the commotion and stated that that hadn't happened since Officer Abreace Daniels came up inquiring about a 1994 case ( L-43324-94) involving an Aggravated Rape (42), six months after the occurrence for which he was/is a suspect. Dot. Gonzales stated that he thought that Officer White was in the First District and that the case involved several Police Officers. Det. Gonzales then produced the case file in the 1994 case for Sgt. Bossetta's review.**

On Sunday, June 22nd, 2003, Sergeant Bossetta reviewed the 1994 case L-43324-94 in which the police officers were suspects. Sergeant Bossetta discovered some striking similarities in the case in 1994 and the case in 2000:

- Both of the victims were forced to remove one shoe.
- The perpetrator exited the crime scene and left ONE shoe, which he would have obviously noticed.
- The victim was taken out the car for the commission of the sexual assault
- The victim was walked a short distance from where the shoe was removed for the assault.
- Both assaults occurred in abandoned areas next to grassy driveways with peaked roofs.
- The perpetrator ejaculated.
- The perpetrator used cruel force causing the victim injury and discomfort that escalated after the victim submitted.
- The perpetrator's description was similar in both cases
- Both victims were Caucasian with blonde hair.
  Both victims were left stranded
  Police weapons were used in both assaults
  The perpetrator kept only ONE shoe

On June 23rd, 2003. at 9:00 A/M,  Sergeant Bossetta spoke with Lt. Hadel of the Central Evidence room to inquire if the Rape Kit was still in evidence. Sgt. Bossetta noticed that during the review of the case that two seminal fluid samples had been obtained from the victim. Sgt. Bossetta then spoke with DNA criminalist Lynn Wesley in order to ascertain if the samples were still in the refrigerator and enough strains were present for DNA testing. Wesley confirmed that the samples were in the refrigerator.

Sgt. Bossetta then informed Lt. Benelli of the aforementioned circumstances. Lt. Benelli instructed the Sergeant to continue to investigate the matter and the he would notify PIB of the interview with Officer White. It should be noted that Officer White was assigned to the First Police District at the time of the aforementioned investigation.

On June 23rd, 2003. at or about 2:30 P/M ., Sgt. Bossetta was met by Detective Allen Gressett, who had just retired from the Police Department, and had come to the Rape office to retrieve some documents. Det. Gressett was the case detective on the original case in 1994. Det. Gressett remembered bits and pieces of the case and was shown the file by Detective/Sergeant Bossetta. Apparently, there is a supplemental missing that would have established why Officer Daniels was a suspect in the case. Detective Gressett stated he could not recall. Detective Gressett did remember that several NOPD Officers were suspected in the case because they had used the victim's cell phone. Detective Gressett concluded that he would look in his personal files to see if he had any further documents.

On  June 23rd, 2003, at 3:30 p/m., Sgt. Bossetta contacted Mr. Jim Hall at Hall & Associates, Phone 1-800-299-5059. Mr. Hall is a retired NOPD Lieutenant who was the commander of the Rape Squad during this time frame. Sgt. Bossetta asked Mr. Hall if he remembered the case, which he replied in the affirmative "about the policemen with the victim's phone". Mr. Hall stated that Abreace Daniel was the perpetrator from what he remembered because of the pictures taken at the ATM machine fit his appearance. Sgt. Bossetta asked Mr. Hall why they (the police) hadn't taken a DNA sample. Mr. Hall related that back then there was no DNA or at least the technology was not available to the NOPD because of the expense. Mr. Hall concluded that no one was ever charged in that particular case with Rape because the victim was maced four times and could not make an ID. Sgt. Bossetta thanked Mr Hall for his time who stated he would assist the police in anyway possible.

On June 23rd, 2003, at 5:00 p/m., Sergeant Bossetta contacted Mr. Peter Labouisse at 582-2729, the victim's father. Sergeant Bossetta announced his authority and purpose in that he decided to contact the father to inform him of the recent developments. Sgt. Bossetta did not want to shock the victim until the matters mentioned were better resolved. The father stated that the victim was alive and well and very committed to following through with any suspects in the case. Sgt. Bossetta thanked Mr. Labouisse and stated he would keep him informed of any further developments.

On June 24th, , 2003 , at 10:00 a/m, Sergeant Bossetta contacted Sergeant Lorenzo of PIB 826-1412 and informed Sgt Lozenzo of the findings. Sgt. Lorenzo stated that he remembered the case when he was assigned to Rape Squad and had been briefed by Lt Benelli on the inquiry made by Officer White. Sgt. Lorenzo agreed that there were many connections to the two cases. Although, they are not identical, the two incidents may be the same suspect. Sgt. Lorenzo agreed with Mr. Hall that DNA was not what it is today and was not used.

On the afternoon of June 26th, 2003, Sergeant Bossetta went to the NOPD Crime Lab and met with Lt. David Skevington & Chief Criminalist, Alen Sison. The officers reviewed the medicals and crime lab information. The officers decided to test the 1994 samples for DNA and place same into the Federal & State data basis, and have same available for future references

Sergeant Bossetta then pondered the connection with Officers White's inquiry. What seemed most strange was that how would White know that this particular case was still open after three years? Why would the composite sketch in the I-20420-00 case have Nexus to the 1994 case? In any event, a composite used to confirm the identity of a possible subject in a passing car does not seem plausible.

Sergeant Bossetta discussed the matter with Sergeant Lorenzo. Sgt. Lorenzo then checked the address of Officer White that was learned to be 3225 Gravier Street  The address has been the same since his employment. Sergeant Bossetta then noticed that Mr. Ivan Young, the maintenance man that found the phone at the Carrollton Parc Apartments in the bushes of former Officer Ellis's Apartment gave an address to the detectives at that time of 3100 Gravier Street, which is essentially next-door on the same side of the street as Officer White  The phone was turned over to Young's supervisor, Mr. Washington, and then to the Apartment Manager, Ms. Kohn  Ms. Kohn then turned the phone over to then Officer Ellis, who kept and used same.

Sergeant Bossetta believes that the connection could possibly be that Officer White had his neighbor find the phone and turn it over to his supervisor, Mr. Washington, then to the Apartment manger, Ms. Kohn. Thus, two innocent veils of insulation were created to protect the person (s) responsible for the Rape of the victim, and/or the theft of her phone. While it may strictly be coincidence, the 2000 case of interest to Officer White, may be the "red herring" to find the information on the composite, being there is a connection to the crime in 1994 and 2000. Officer White would be the best candidate to make the inquiry because of having no connection to the 1994 case until possibly now.

The main suspect in t 1994 rape case, Officer Abreace Daniels, was tentatively identified as per a line-up shown to her by Sgt. Roland Foreman of the Rape squad as documented in the inter-office dated March 15th, 1995.

The suspect, Officer Daniel had access to car 124, and the phone. In another inter-office, Officer Daniel came to the rape office as documented in September 18th, 1995, and made inquiry as to the 1994 case  The document was authored by Det. Ned Gonzales and sent to PID commander, Major Felix Loicano.

Sergeant Bossetta was Detective Mathews supervisor in the 2000 case. Detective Mathews husband, Roland Mathews was in the First District at the time of the 1994 case and was friends with all the officers involved in this case. Sergeant Bossetta cannot fathom to this date that since Detective Mathews involvement in this case, her work effort and demeanor plummeted  Consequently, Sergeant Bossetta did most of the follow-up on the case

Det. Mathews did not show any improvement, and in fact worsened. The supervisors found it necessary to transfer her to the patrol division. Sergeant Bossetta ordered Det. Mathews to return all files in her possession, and to complete the report on the 2000 case before the Friday she was transferred. Sergeant Bossetta was on the evening shift and returned to duty that Friday and had the files on his desk. The 2000 case did not have the report in it and was missing several pertinent documents from the investigation.

Det. Mathews had been furlough off and on, but did bring up a "disk" to the office, which she gave to Det. Gressett who was assigned the case. Det. Mathews stated to Sergeant Bossetta that the report was on the disk and she had just forgot to print it. Det. Gressett later informed Sergeant Bossetta that a face sheet was on the disk but nothing else. Sergeant Bossetta then contacted Det. Mathews only to learn that she had resigned from the Police Department.

Sergeant Bossetta did not initially investigate the 1994 case. However, in order to fully understand the importance of the possession of the victim's phone and the need to enact the current DNA technology, one must consider the time frame. In 1994 cell phones were an icon of the prosperous, and few if any police officers could afford them. Moreover, even the Chiefs were not equipped with them. Surely, the unlimited open use of the cell phone for that amount of time by the officers on the pen register would have raised suspicion. The "fruits of the poisoness tree" with the possession and use of the victim's cell phone for the extent of time involved gives rise to criminal intent. Admittedly, there are several points which may be construed, as coincidental or circumstantial.

Intuitively, the premise of the interest generated in the 2000 case may have been prompted by the recent developments in the Derrick Todd Lee case. The bucal swab was predicated upon the likeness of an old composite drawing that was similar to the description of the wanted subject, but was overlooked. . The results of the DNA swab broke the case.    However, to continue to speculate, vacillate, or procrastinate on the use of the newer DNA technology is of harm to the victim, the suspected, and the integrity of the New Orleans Police Department, all of which have suffered greatly.  It is time to proceed forthwith with the typing of DNA through the use of a simple bucal swab beginning with the main suspect, Abreace Daniels, BM, 9-15-65.

In summary, DNA typing is the fairest, most precise law enforcement tool available to all the aforementioned parties, which will either eliminate or incriminate the established suspect (s). DNA typing knows no bias, which will serve justice blindly to all of interest in this case. Subsequently, the urgent request of the Sex Crimes section is that the Public Integrity Section of the Police Department, having the proper jurisdiction in this matter, seek out a search warrant for DNA typing.

On Tuesday July 15th, 2003. Sgt. Bossetta and Detective Michael McCleery traveled to Navarre Beach , Florida , for the purpose to re-interview ing the victim and the witness in the I-20420-00 case. However, believing strongly that the perpetrator in the L43324-94 case may be one in the same, Sergeant Bossetta elected to include the report to follow as part of the original supplemental as aforementioned. The detectives checked into the Holiday Inn Hotel, at 8375 Gulf Blvd., ph# (850) 933-4768.  room # 2194.  Upon arrival, the detectives made contact with the witness and the known victim's companion the night of the rape, September 12th, 2000.

The detectives secured a conference room at the hotel in order to conduct the interviews.  The detectives interviewed Ms. Tuttle, whose account of the incident was basically the same as originally given. Ms. Tuttle stated that she remembered the incident and thought that she could identify the person she had seen in the bar with her friend  Ms. Tuttle stated that upon entering the bar, Johnny White's Sport's Bar on Bourbon, was that she wanted to see her friend, the bartender, Tom Pye, because he was dying. Tuttle stated that she felt responsible for the incident, because she had come to New Orleans to look for a job in the Bar business, and asked if KWFV wished to accompany her.

Tuttle stated that they went out drinking and entered the bar after leaving the OZ located in the next block about 4 a/m.  Tuttle stated that after about 45 minutes elapsed, a black male, wearing a black "Polo" style shirt came in the bar and began "hitting on" her friend, here after referred to as Known White Female Victim ( KWFV).

The black male insisted on them joining him for his "birthday" at Harrah's casino to celebrate it. The subject stated that he was from Marietta, Ga., introduced himself as "Byron" and then offered them a ride to their hotel. Tuttle described the black male the same as originally, and stated that they were not going anywhere with him because he was black and she did not trust him. Tuttle claimed that she was blunt and insulting to try to get him to leave them alone.

However, she stated that KWFV was trying to apologize for her statements and was befriending "Byron" because she felt sorry for him  At that point, KWFV went to the bathroom and when she returned, Tuttle went to the bathroom. Tuttle stated that when she came back, the bartender, Pye stated that her friend got in a white car which was parked on the downtown/river corner of Orleans facing Bourbon, with the black guy and left. Tuttle stated Pye overheard the black guy telling KWFV that "Katie said it was ok, but I have to move the car around the block because the street sweepers are coming and it will get towed".

Tuttle stated she was "pissed" at first because KWFV was married and drunk and ignored her warning that the "blacks here are different from where they are from ". Tuttle stated that she went back to the room and when she did not see her friend was home, she took a cab to Harrah's Casino to look for her friend. When she did not see her she reported her missing and went back to the hotel. Later that morning she learned of her friend's demise. Tuttle stated that eventually the pressures of that night forced their friendship apart and they just recently within the past couple of weeks were able to start a relationship. However, the relationship was not as close as previously.

At this point the detectives asked if Ms. Tuttle would view a group of photographs. The detectives clearly stated that the perpetrator may or may not be in the line-up. At this time, 9:15P/m., Tuttle viewed a line-up wherein picture number four was that of a suspect Detective McCleery had developed by the name of Byron Glapion. Glapion was considered a possible suspect because of a history of rape where he bit the victim and was respondent to the description of the assailant. Tuttle perused the pictures and stated that she really did not recognize anyone other than number four maybe resembled the perpetrator, but that with the amount of hair it was improbable. As instructed, Tuttle signed the rear of the line-up and wrote "maybe".

At this time, Tuttle was shown a second line-up with the suspect Abreace Daniel in position number four. The pictures were exposed in black & whiter. Sergeant Bossetta covered the side portion that exposed Daniel's SID number. Tuttle went to number four and stated maybe then said or maybe number three, but she was not sure. Tuttle signed and dated the rear of the line-up. It should be noted that this line-up was smaller in size then the first, and the SID numbers were listed on the back.

Sergeant Bossetta then showed Tuttle a third line-up that was similar to the second in size, but was in color exposure  The same two pictures of number three and Abreace Daniel were in this line-up as well, but their respective positions were shuffled. In this set of photos the suspect, Daniel was in position number three.  Sergeant Bossetta again covered the information on the right side of the line-up and placed same on the table. Tuttle immediately pointed to picture number three, suspect Daniel and exclaimed "Oh MY, this one is very possibly the guy." Tuttle signed the back of the line-up, "#3 very possible".

Sergeant Bossetta then thanked Ms. Tuttle for her time and informed her not to mention any of the interview to KWFV. Tuttle stated she really doesn't talk with her anymore and would not. Tuttle did ask if she could come back the next day with KWFV If it would be ok with the detectives. The detectives stated that was between her and KWFV, but that Tuttle would not be allowed in the interview.

On the following morning, July 16th 2003, at 10:00 a/m , the detectives met with the KWFV at the Hotel The detectives had her fill out a Louisiana victims' Registration form to update her information. KWFV was calm and pleasant throughout the interview but did tremble and quiver.  KWFV stated that she has been in pain management since the incident and receives epidurals every year for her back  KWFV stated that beyond the initial injuries she sustained 9 broken bones and several fractures   KWFV lost 45 pounds and her scars are healed but somewhat noticeable. KWFV stated that she is very committed to the investigation and will do anything for which may be required of her. KWFV stated that Ms. Tuttle is also committed to aiding the investigation.  KWFV also provided the detectives with a sexual assault questionnaire that she had filled out prior to the interview and gave it to the detectives

KWFV stated that she did not speak to Tuttle the night before.  Sergeant Bossetta asked her to account for the entire incident, as best she remembered.  KWFV stated that she came with Tuttle to New Orleans in September 2000, because she wanted to get away. Tuttle was looking for a job in the bar business, and KWFV came along.  KWFV stated that she was upset with her husband was going to meet a guy from Texas in New Orleans.  The meeting took place and she had consensual sex with the man from Texas.  However, they became involved in a dispute and she "dumped" him.

That night, Monday, September the 11th, 2003, she went out with her friend Tuttle drinking in the French Quarter  KWFV stated they went to the OZ club because it was a gay place where they could hang out without being bothered by men.  The night was late when they started and they left OZ at around 4 a/m  As they were walking on Bourbon they entered Johnny White's Sports Bar where Tuttle knew the bartender, Pye.  Pye invited them in for a shot, and they sat at the bar and had more drinks.

About 45 minutes later, a black male entered the bar and introduced himself as "Byron"   KWFV described him as a nice looking man with a balding head, 6'2", 230 lbs , 30-33 years old, and cut (built) like a football player. KWFV stated he was wearing a black "polo" shirt that had an emblem on the left front in red with an "R" and a red line tracing down vertically. (Possibly the Red Eye, or Razzo's) KWFV stated that he had manicured fingernails and was wearing Kaki pants that were immaculately pressed.  She stated that he was manly, but he had an odd voice that was soft and almost feminine.  Most particular was he had eyes which looked almost "made up" which were also slightly feminine.

The subject "Byron" stated that he was from Marietta, Ga.  and was in New Orleans for a sales training seminar for his job there.  He was staying over because it was his birthday and he was "depressed" because he was alone.  "Byron " stated he was married but was having problems with his wife, and was "hitting on" KWFV as she described it.  KWFV stated that he was very articulate and seemed well educated and had a unique manner in obtaining ones trust

KWFV stated that she was not interested as did Tuttle, but he became persistent in trying to get the "ladies" to accompany him to the Harrah's Casino for his birthday celebration.  KWFV stated Tuttle said they were not interested and to leave her friend alone.  "Byron protested why she (Tuttle) did not like him, and wanted to give us a ride to the hotel for our safety. KWFV stated that she was not going anywhere with him and she did not like or trust Black men.  KWFV stated that the bluntness of Tuttle's comment caused her to feel as though she had to apologize to him and was being friendly for that reason only. KWFV stated she wanted no part of any more extra marital affairs, and does not do any drugs.  (Which never came up or was offered to her).  KWFV pressed that she was pretty intoxicated and was ready to leave.  At that point she went upstairs to the restroom and "Byron" followed her.

KWFV then came out the restroom and Byron stated that her friend said  it was OK to ride with him back to their hotel.  Tuttle went to the bathroom and Byron stated we'll be waiting for you down here. (on the street)  Byron stated to KWFV to get in the car because he had to move it around the block because the street sweepers were coming and it would get towed.

KWFV was hesitant but stated that Byron was pulling on her in a persistent manner.  KWFV got in the car and noticed "BONNEVILLE" on the dash and it smelled like a rental car and had blue interior and was knew.  KWFV realized that after a couple of blocks they were not going back she turned to ask Byron where he was going.  At this time,  Byron  struck her  and knocked her head against the passenger window and  stated "you gonna give up that pussy to me bitch, and you gonna Die Bitch.'

KWFV stated that she was in the car for a long time and then he hit her again.  The car stopped by a large gate and before he got out he hit her again.  KWFV stated that she was so terrified she was "frozen".  KWFV thought he was opening a large chain link gate, and then quickly y returned to the car, he drove into an apartment looking complex that looked like a  "ghetto".  He stopped the car and pulled her across him and dragged her by her hair up to the steps  KWFV stated that at this time he said take off one shoe and place it down on the ground.  KWFV stated he was " Enthralled" as she crossed her leg over and removed her shoe, and then as she was bent over she punched him in the groin in an effort to escape

KWFV stated at this point he stood her up and had her firmly by the hair and stated "scream now as loud as you want you white bitch cause nobody going to help or hear you or help you now". KWFV stated that all she remembered was that he was beating her and choking her on the steps while laughing out loud and asking her "Bitch, Die Bitch, why won't you Die, Bitch ".

KWFV stated that she came to again, but faked like she was dead. KWFV stated that she was bent over like a football player looking back through her legs and he was "smushing" against her vagina. KWFV stated that as horrid as the incident was in her mind she stated that here she is being murdered and raped and he can't even do it. His penis was small and that she thought he was masturbating or something. As he was leaving he stated " I'm going to think of your dead ass at my birthday dinner with my wife and kid".

The subject then returned to the car and the engine sounded and he was gone. KWFV stated it was light and she was covered with globs of blood and nude   She thought she was dead and woke up in the emergency room. KWFV stated that she thought there were some other events but she was not sure and asked to see the crime scene photographs. Sergeant Bossetta warned her of the graphic nature of the photos and suggested she not view them.

Sergeant Bossetta then asked KWFV to view the photos and explained that the line-ups may or may not have the perpetrator in them  Sergeant Bossetta stated that she pick out the picture of the person or persons most familiar to her pertaining to this incident. Prior to showing the line-ups, Sergeant Bossetta covered the back and sides of the line-ups as described earlier.

At  1:30 p/m. Sergeant Bossetta showed the line-up of suspect Glapion in position number four. KWFV almost immediately stated that no one looked familiar to her.  Sergeant Bossetta instructed Wenger to sign, date and time the rear of the line-up.

At  1:30 P/M., KWFV viewed the second line-up wherein suspect, Abreace Daniel was in position number four.  KWFV immediately stated it's none of these five and tapped repeatedly on Daniels picture stating this one looks the most familiar.  KWFV signed the rear of the line-up with number four.

At  1.40 P/m  KWFV was shown the color photo line up, and perused the photos  KWFV pointed to picture number three of suspect, Abreace Daniel. KWFV stated that he was darker as she remembered like picture number five, but that that number three was the most familiar.  KWFV went to sign the back and began to get chills and sweat again.  As she signed the back she flipped the line-up over and stated "oh yea, yep, this picture is really affecting me". KWFV returned the line-up and asked if the sergeant had a bigger photo of the one she had picked out? Sergeant Bossetta showed her a larger photo AFTER the line-up and KWFV looked directly at Sergeant Bossetta and nodded several times "I really think that's him, he even looks like the composite should have looked ".

KWFV then again insisted on seeing the crime scene photos. Sergeant Bossetta, upon showing her a photo of her breast where she was bruised stated that this is one of the bite marks  KWFV stated that she was not bitten, that was from the thing he poked me with, and hit me with.  Sergeant Bossetta was puzzled and stated that she never mentioned anything about a weapon before!  However, KWFV was trembling as she recalled that it wasn't until she saw the picture that she remembered "it". Sergeant Bossetta asked her to describe "it" and the circumstances surrounding the "thing".

KWFV started to shake and sweat as she stated that after she first got hit, she came to on the console area and smelled a musical instrument smell that wasn't there before.  She said she saw "it" by his leg on the seat and noticed it was cylinder shaped and black and silver, but the ends were different.  When he went to hit her with it, she grabbed it and found it to be heavy but soft like a wine cork texture KWFV was sure it was not a gun, but it hurt like hell when he jabbed and poked me with it.  She stated that the end felt like a small triangle that was mettle like a meat-tenderizing tool and it "rattled" as if it were full of quarters or change  KWFV stated that she was amazed that she hadn't remembered "it" until now, but it was the most painful thing she ever felt  She stated that one end was silver and hard and the other end was black like rubber  KWFV seemed entranced as she spoke of "it". and stated she had no idea what it was.

Sergeant Bossetta realized that what she was describing was an ASP/ a police expandable baton, but did not inform KWFV. Sergeant Bossetta then informed her for her time, and stated that he would be in touch. KWFV pressed if that was really the guy because she did not want to make a mistake and have the "wrong" guy go to jail. Sergeant Bossetta escorted the victim to her car and she stated that she really was surprised that she never remembered "it" until she saw the photos. KWFV stated that she really was feeling relieved all of the sudden and more confident about the pictures she picked out. KWFV thanked the sergeant and stated that she was very grateful to the Police Department for still caring about her case after all this time.

Sergeant Bossetta then returned to the room and contacted Lt. David Benelli and informed him about the identifications and the ASP. Lt. Benelli stated that upon return the detectives would meet with PIB. The detectives returned to New Orleans the next day, Thursday the 17th, of July 2003

On Friday July 18th, 2003, at 1:30 P/M., Sergeant Bossetta and Lt. Benelli went to PIB and met with Captains Donald Curole and Joseph Lapinto, and Lt. Ida Sonnier of the Criminal Investigations Division. Sergeant Bossetta articulated the aforementioned to the officers and produced the signed and dated line-ups /Abreace Daniel was identified as the perpetrator four out of eighteen times after three years had elapsed. It should be noted that the sergeant also had the victim, KWFV sign, date and describe the assailant's wishes on the rear of the picture of the removed shoe.

**Sergeant Bossetta, having thoroughly investigated this matter, wherein the availability of the DNA technology exists and the concomitant evidence within both matters are congruent to wit the modus operandi, the corpus delecti, and the suspects description and consequent identification by the victim and witnesses in these cases strongly suggest that probable cause exists. The DNA technology processed and profiled by and within the capacity of the New Orleans Police Department shall facilitate the most un-bias, accurate, and precise means to serve Justice blindly with regard to the elimination and/or incrimination of the suspect named herein. The undersigned affiant preys and shall truthfully swear to that the aforementioned facts and circumstances are true and merit the issuance of this warrant according to Law.**

_Sergeant M J Bossetta Sr_

AFFIANT

Sergeant Michael J Bossetta, Sr., # 274

SIGNED AT NEW ORLEANS LOUISIANA
On THIS THE 22nd, DAY OF July, 2003

_Harry E Cantrell_

COMMISSIONER HARRY E CANTRELL JR
MAGISTRATE SECTION 3

JUDGE, ORLEANS PARISH
COURT _____ SEC _____.

**CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS**
**STATE OF LOUISIANA**

Case No: _____                    Item No: I-20420-00

## SEARCH WARRANT

### ORDER OF SEARCH

TO:   THE SUPERINTENDENT OF THE NEW ORLEANS DEPARTMENT OF POLICE
and/or HIS DESIGNATED REPRESENTATIVES.

AFFIDAVIT (S) HAVING BEEN MADE BEFORE ME BY _____
Sergeant Michael J. Bossetta, Sr., Badge # 274, Sex Crimes Section, I.S.D._____

THAT he has good reason to believe that on or in the
(premises) (person) (vehicle) located at 1999, Pontiac Firebird, color White Lic # Louisiana JCK
339. Registered to the suspected, Abreace Daniel, BM, 9-16-1965._____
Within the Parish of Orleans, state of Louisiana as more fully described in the application for this
warrant, there is now being concealed certain property, namely;

One leather shoe, two tone green bright sandal type shoe. One black "polo" shirt with a red
"r" type insignia, Kaki pants Chemical mace or pepper gas, one or more Police expandable baton
(s) ASP Any and all serology and forensic secretions consistent with the sexual activity, including
intercourse, with a known Caucasian female  Those named secretions that would establish,
facilitate, support, process, and profile DNA evidence, substantiate and trace,  of the suspected
possessing the above vehicle listed to wit Abreace Daniel soc sec 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,  at the NOPD Crime
Lab, and all concomitant evidence related to the above captioned Item number to wit I-20420-00.
_____

WHICH said property constitutes evidence of the commission of a crime or offense
against the Law of the State of Louisiana set forth in the Louisiana Revised Statutes, and as I am
satisfied from the affidavit (s) submitted in support of the application for this warrant that there is
probable cause to believe that the aforesaid property is being concealed on the (premises) (person)
(vehicle) above described, and that the aforesaid grounds for the issuance of this search warrant
exits;

YOU ARE HEREBY ORDERED to search forthwith the aforesaid (premises)
(person) (vehicle) for the property specified, serving this search warrant and making the search,
and if the property be found there, to seize it, leaving a copy of this warrant and a receipt for the
property seized, to make your written return on this warrant including a written inventory of the
property seized, and to bring the said seized property into the court (before the judge, the clerk,
the sheriff, or any court officer who usually acts as the custodian) within ten (10) days of this date
as required by law.

YOU ARE (ARE NOT) AUTHORIZED to execute this warrant and to make this
search during the daytime or the nighttime and if the property herein described be found on the
(premises) (person) (vehicle) herein described to seize said property in accordance with law.

YOU ARE (ARE NOT) AUTHORIZED to execute this warrant and to make this
search on a Sunday and if the property herein described be found on the (premises) (person)
(vehicle) herein described to seize said property in accordance with law.

THIS WARRANT MADE IN DUPLICATE ORIGINAL, NEW ORLEANS, LOUISIANA,

THIS____22nd  23 w/R_____ DAY OF____July_____, 2003___,

JUDGE, SECTION                      _____"
CRIMINAL DISTRICT COURT

COPIES:
Original - Unit File
1st Copy  - Judge signing Warrant
    Copy  - Person upon whom Warrant is served
    Copy  - District Attorney
    Copy  - Record Room
    Copy  - Judge signing Warrant when making Return

PLAINTIFF'S
EXHIBIT
2

| NEW ORLEANS POLICE DEPARTMENT – GIST SHEET | PAGE  2 OF  # | I-20420-00 |
|---|---|---|

**I, SERGEANT Michael J. Bossetta, Sr ,  EMPLOYED BY THE NEW ORLEANS POLICE DEPARTMENT, AFTER BEING SWORN STATE:**

**(Abreace Daniel) ARRESTED SUBJECT ( B    )RACE ( M      )SEX ( 9-16-1965 )D.O.B.**

**RESIDING AT 7417 Mayo Blvd. NO,LA. ,WAS ARRESTED AND CHARGED AS STATED ABOVE.**

**SWORN TO AND SUBSCRIBED BEFORE ME THIS  23rd         DAY OF July, 2003**
**AT NEW ORLEANS, LOUISIANA.**

| Sergeant Michael J. Bossetta, Sr.  274/ ISD Sex Crimes<br>AFFIANT | SUPERVISOR _____ _____ |
|---|---|

On July 23, 2003 at  8:00 a/m., Sergeant Michael Bossetta and Sergeant Joseph Lorenzo effected the arrest of  the above subject to wit Abreace Daniel, BM, 9-16-1965 pursuant to a lawfully signed Warrant of Arrest for the offenses as related to the Aggravated Rape of a known female which occurred on September the 12th, 2000., at 2639 Bartholomew Street .

The subject was advised of his constitutional rights on NOPD Rights of Arrestee Form No. 235652., by Sergeant Michael Bossetta of the NOPD Sex Crimes Section., at the Public Integrity Bureau., at 7:45 a/m, this date. The subject,  Daniel was additionally presented with a search warrant under this item number and also item Number L-43324-94 and pursuant to same submitted to a bucal swab collected by the NOPD Crime Lab Technicians for the purpose of obtaining DNA samples for evidence.

The arrested subject , Abreace Daniels refused to give a statement and was transported to Central Lock-up and booked accordingly by Sergeants Errol Foy and Sergeant Claude Flot of the PIB.

PLAINTIFF'S EXHIBIT 3

| JUVENILE CUSTODIAL RELEASE FORM | | | | |
|---|---|---|---|---|
| X<br>NAME (PRINT) | X<br>ADDRESS (PRINT) | | X<br>(DATE/TIME) | X<br>RELATIONSHIP |
| HEREBY TAKE CUSTODY OF THE ABOVE NAMED CHILD AND PROMISE TO BRING HIM/HER TO COURT, PROBATION DEPARTMENT, OR THE JUVENILE DIVISION, WHEN NOTIFIED. | | | | |
| X<br>RELEASED BY (PRINT) | | SIGNATURE<br>CUSTODIAN | X | |
| REPORTING OFFICER | BADGE | | CAR/UNIT # | |
| SERGEANT MICHAEL BOSSETTA 274 | | | 4550 | |

DEPARTMENT OF POLICE
NEW ORLEANS, LA.

**No. 235652**

## RIGHTS OF AN ARRESTEE OR SUSPECT

DAY _WED_ DATE _7-23-03_ TIME _745 AM_ ITEM# _20420_

LOCATION _3900 North Villere_ DIST _1_
Street No. - and Street

NAME _Harris_ , _Carl_ _L._
Last      First      Middle

BIRTH DATE _1-16-65_ RACE _B_ SEX _M_ AGE _37_

ADDRESS _7400 Mayo Blvd._
Street No. - and Street

☐ I am investigating—OR—☐ _9011_ CITY _N.O._ STATE _LA._

☑ You are under arrest for alleged Violation of Revised Statutes of 1950,
as amended, ARTICLE _14:42.1_ RELATIVE TO _AGG._
_Rape / Attempted Murder_

The possibility of your participation in other crimes is also under investiga-
tion. According to provisions in the Constitution of the United States and
of the State of Louisiana it is my duty to inform you that:

I       You need not make any statements; that is, you have a right to re-
        main silent;
II      Anything you say may be used against you in trial;
III     You have a right to consult with and obtain the advice of an attor-
        ney, before answering any questions;
IV.     If you cannot afford an attorney, the court will obtain an attorney
        to represent you and advise you;
V       You have a right to have your attorney or an appointed attorney
        present at the time of any questioning or giving of any statement.

DO YOU UNDERSTAND WHAT I HAVE JUST READ TO YOU? ☑ YES
                                                   ☐ NO

NOTE:   IF THE PERSON DOES NOT FULLY UNDERSTAND AND INTELLIGENTLY
        AND VOLUNTARILY WAIVE THE RIGHT OF COUNSEL, HE CANNOT BE
        QUESTIONED   IF THE PERSON AT ANY TIME DURING THE QUESTION-
        ING ASKS NOT TO BE QUESTIONED FURTHER OR INDICATES IN ANY
        MANNER THAT HE DOES NOT WISH TO BE QUESTIONED, THEN THE
        QUESTIONING MUST CEASE.

I UNDERSTAND WHAT HAS BEEN READ TO ME AND WITH FULL
KNOWLEDGE OF MY RIGHTS I WISH TO WAIVE ALL PRIVILEGES
AGAINST SELF INCRIMINATION AND MAKE A STATEMENT ABOUT
MY KNOWLEDGE OF THE COMMISSION OF THIS CRIME.

_____
Signature of Arrestee or Suspect

I have read and explained the RIGHTS OF AN ARRESTEE OR SUSPECT
to the person named above, and he . . . . .

☐ SIGNED, WAIVING HIS RIGHTS
☐ REFUSED TO SIGN
☐ WAS UNDECIDED, CONSEQUENTLY WAS ADVISED NOT TO SIGN
☐ DID NOT UNDERSTAND, AND DID NOT SIGN
☑ PREFERS TO SPEAK WITH ATTORNEY BEFORE MAKING DECISION
☐ OTHER - (EXPLAIN IN REMARKS)

CONCLUDED: DAY _WED_ DATE _7-23-03_ TIME _747 AM_

COPY GIVEN TO PERSON BY _Vincent M. Rossetti_
                        Signature of Officer

BADGE _394_ ASSIGNMENT _1 D Sex Crimes_

PRINT NAMES OF OFFICERS and/or WITNESSES TO ABOVE

_Sargeant Joe Lorenzo 192_

REMARKS _____

NOPD FORM NO. 153 - 8/73     CENTRAL LOCKUP COPY

PLAINTIFF'S
EXHIBIT
4
FIRBAD-Repress, N. J.

# Orleans Parish Criminal Sheriff
## Arrest Register
*Magistrate Court Copy*

## Arrested Person Information

| Folder No. | Arrest No. | Item No. | B of I No. | Motion No. | Soc Sec No. | SID Number | FBI Number |
|---|---|---|---|---|---|---|---|
| 1176769 | 11272625 | I2042000 | 286692P | 877738 | 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 | | |

| Arrested Person | | Race/Sex | DOB Date | Height | Weight | Hair | Eyes | Skin |
|---|---|---|---|---|---|---|---|---|
| DANIELS, ABREACE | | B  M | 9/16/1965 | 602 | 260 | BLK | BRO | MBR |

| Address | Occupation | Marital Status | Birth State | Nationality |
|---|---|---|---|---|
| 7417  MAYO ST | POLICE OFFICER | Married | LA | USA |

| City | State | Employer | License No. | State | Year |
|---|---|---|---|---|---|
| NEW ORLEANS | LA | NEW ORLEANS P.D. | 4079 | | |

| Alias Name(s) | Scars | Marks | Tattoos | Fingerprint Classification |
|---|---|---|---|---|
| | | | | 121016PMPOPI0716PIPI |

| Health Information | Drug Addict | Drug Type |
|---|---|---|
| | | |

| Vehicle License State Year | Vehicle Year | Make | Model | Type | Color | Vehicle ID Number | Disposition |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

## Arrest Information

| Location of Arrest | Dist/Zone | Arrest Date / Time | Booking Date / Time | Arrest Credit |
|---|---|---|---|---|
| 118 N ROCHEBLAVE ST | 1 | 7/23/2003  0800 AM | 7/23/2003  1253 PM | 37 |

| Arresting Officer Name | Badge | Unit | Transporting Officer Name | Badge | Unit |
|---|---|---|---|---|---|
| SGT. M.J. BOSSETTA | 00274 | 4550 | SGT. J. LORENZO | 00192 | 4550 |

## Charge Information

| Ordinance/Statute No. | LibrsCd | Affidavit No. | ATN Number/Seq | Relative To |
|---|---|---|---|---|
| RS 14  42 | | | 360040331239 | 1  AGG RAPE |
| RS 14  (27) 30 (1) | | | 360040331239 | 2  ATT 1ST DEGREE MURDER DURING C |
| RS 14  44 | | | 360040331239 | 3  AGGRAVATED KIDNAPPING |
| RS 14  34 | | | 360040331239 | 4  AGGRAVATED BATTERY |

## Court Information

| Trial Court / Section | Trial Date / Time | Bond Amount |
|---|---|---|
| CDC       M | | $.00 |

## Offense Information

| Location of Offense | Offense Day / Date / Time | Weapon |
|---|---|---|
| 2639  BARTHOLOMEW ST | 9/12/2000  2:30 AM | |

| Witness 1 Name | Race/Sex | DOB Date | Phone No. | Witness 2 Name | Race/Sex | DOB Date | Phone No. |
|---|---|---|---|---|---|---|---|
| STATE OF LOUISIANA | | | | FEMALE KNOWN | | | |

## Remarks

GIST....SEE OFFICER'S REPORT
WERE YOU PHYS ABUSED BY A/O?  "NO."
ASSIGNED TO TP3 REC

| Doorman | Time | Booker |
|---|---|---|
| SMITHJ | 00 34 PM | Ward,Audrey |



PLAINTIFF'S
EXHIBIT
5

001176769

NEW ORLEANS POLICE DEPARTMENT
EDWIN P. COMPASS III
SUPERINTENDENT



# NEWS RELEASE

Contact: Public Affairs Division
715 South Broad Street
New Orleans, Louisiana 70119
Telephone (504) 826-2828
www.new-orleans.la.us/cnoweb/nopd

July 23, 2003

## NOPD Officer Arrested
## for Sexual Assault

New Orleans, La. – Today, Superintendent Edwin P. Compass III announced the arrest of a member of the New Orleans Police Department in connection with the September 12, 2000 sexual assault on a 31-year-old Florida woman. The officer has been identified as 37-year-old Abreace Daniel, a 15-year veteran of the force assigned to the Seventh District. The incident occurred between 4:00 am, and 5:00 am, in the 2600 block of Bartholomew Street.

According to investigators, the victim was visiting New Orleans and in the French Quarter when a subject approached and the two conversed. During which time, he offered to drive her back to the hotel. The woman agreed, and as the two drove away she realized this individual was not taking her to the hotel. As the subject continued to drive, he retrieved a blunt metal object from the vehicle and struck the victim in the head.

She was taken into a section of the Florida Housing Development that was under renovation and sexually assaulted her (rape). During the attack, the woman was beaten severely and afterwards left on the scene. She managed to wander out of the building and sought assistance from residents who immediately telephoned the police department. The woman was taken to a local hospital, where she was treated for contusions, bruises and lacerations to the head.

Following the initial investigation, Sex Crimes Detectives were able to obtain a sketch composite of the subject with the assistance of the victim and the Police Artist. However, nearly three years later the case had remained unsolved, until investigators revisited the case and discovered a glaring resemblance between the composite and the officer in question.

** More **



PLAINTIFF'S
EXHIBIT
6

Page Two
July 23, 2003
Officer Arrested in Assault

Acting on a possibility, Detectives conducted a photographic line-up and almost immediately the victim positively identified him.

This morning, Daniel was taken into custody by agents from the Public Integrity Bureau and later booked at Central Lock up with Aggravated Rape, Attempted Murder, Aggravated Battery and Second Degree Kidnapping.

Superintendent Compass has immediately suspended Daniels, without pay, pending a disciplinary review and said, "Although, I am disheartened by today's arrest, I am proud of the fact that Detectives from Sex Crimes Unit and members of the Public Integrity Bureau were able to identify the person responsible for such a heinous crime.  I reaffirm the department's position that every member of this department will be held to a higher standard of professionalism and shall be held accountability for his or her actions with no exceptions."

Daniel was also the subject of a 1995 sexual assault case that resulted in him being arrested and eventually acquitted by an Orleans Parish Jury.  This case, he allegedly picked up a stranded female motorist and forced her to engage in an oral act.

## 

Captain Marlon A. Defillo

## A NEW ORLEANS POLICE OFFICER, TWICE JAILED FOR RAPE, TWICE CLEARED. BUT NOW ABREACE DANIEL AND HIS FAMILY MUST DEAL WITH THE WHISPERS AND THE STIGMA OF BEING CALLED A RAPIST.



STAFF PHOTO BY ALEX BRANDON

If you're cleared in a shooting or a killing, it's over with. But if you're accused of a sex crime, especially more than once, it stays with you, said New Orleans police officer Abreace Daniel, holding a sketch of the rapist. People look at you funny.

# the stain of ACCUSATION

**By Michael Perlstein**
Staff writer

Branden, 9, cried almost every day, sometimes for hours. Boys at school pushed him around. "Your daddy rapes little girls," they'd tease.

Jardyn, almost 5, was too young to understand anything except that her dad wasn't home to tuck her into bed, to take her to her first day of preschool or to whisper her hair using their special technique carefully perching a towel on her forehead so he wouldn't accidentally "wash her eyes."

Kristoffer, 16, decided to become the ...

... man of the house. He mimicked his father's stoic demeanor, calm voice and — with his St. Augustine High School uniform — the methodical way his dad ironed his police shirts. He reassured his mom and shielded his little brother from fights. He remained unemotional, even after his friends stopped coming by the house, except for the day he lost it and screamed in his grandmother's face. She had stopped him from stealing a car to rescue his little brother from school.

"The other kids were trying to break his little heart, saying our Daddy was a rapist man," Kristoffer explained.

See STAIN, A-4

### Twist of fate

Local soldier Army Spc. Lance Legard survives the war in Iraq only to drown in a lagoon on an outing with his family and friends.

See DROWN, A-4



STAFF PHOTO BY ELIOT KAMENITZ

We thought if something was going to happen to Lance, it would be over there, Regina Kade said Monday of her son, Army Spc. Lance Legard, who apparently drowned in a local golf course lagoon.

---

| Classified | D | Editorials | B-6 | National | A-10 | Television | F-7 |
| Comics | D-10 | Living | E-4 | People | A-12 | Washington | F-8 |
| Deaths | B-3 | Money | | Sports | E | World | A-11 |

CHANCE OF STORMS
HIGH 85 LOW 69 Weather, F-8

PLAINTIFF'S EXHIBIT 7

New Orleans police officer Abreace Daniel is back with his family, from left, Branden, 9, Zina, Jardyn, 2, and Kristoffer, 16. The family is still trying to put the pieces o...
life together after Daniel spent five weeks in jail.

2:04-CV-02034-MVL-KWR   Document 1   Filed 07/20/04   Page 34 of 35

# 'It's . . . like walking on eggshells'

"I don't think anyone will ever know what happened to that," Raspanti said. "My feeling is that he doesn't even know why he did it."

Roy was scheduled for trial Monday before state District Judge J Sterling Snowdy to face charges of first-degree murder, which is punishable by death or by life in prison without the chance for probation or parole. Court officials had expected the trial to last for weeks.

Instead, Roy agreed to plead guilty in exchange for the life sentences.

"We feel the penalty is appropriate and will bring closure to the family," said George Ann Graugnard, the assistant district attorney prosecuting the case. "We feel it's an appropriate plea under the circumstances."

Snowdy told Roy that he was surprised that Roy showed no remorse during any of the court proceedings.

"You've caused a lot of havoc," Snowdy said.

Roy, in an orange prison-issued jumpsuit, with his hands and feet shackled, kept his eyes focused on the judge during the 30-minute proceeding. While he didn't show any emotion during the hearing, his wife's family cried and held each other as the judge sentenced him.

On April 17, 2002, Roy walked into the St. John the Baptist Parish Sheriff's Office and told a detective he had killed his family and had remained at home with the bodies all day.

At the time, authorities say Roy told detectives he was unhappy with his marriage and had some financial problems. A few weeks before the murders, Roy had filed for bankruptcy to avoid losing his home. Court records showed that he owed thousands of dollars in hospital bills and had several past due accounts.

Initially, Raspanti had Roy examined by doctors to determine if he was mentally fit for trial and to determine his mental state at the time of the crime.

On Monday, Raspanti said Roy wanted to avoid a trial and begin serving his sentence.

"I think this is the best way to put this case to rest," Raspanti said. "You can't bring the children back and you can't bring (Melissa) back but maybe you can have some closure."

At the short hearing, Givens told Roy he made the right decision by avoiding a long, emotional trial.

"Words can't describe how we feel as victims," he said. "No one can imagine what we have been through these past few months."

*     *     *     *     *     *     *

Lolly Bowean can be reached at lbowean@timespicayune.com or (985) 652-0952.

## STAIN, from A-1

For five weeks this summer, while veteran New Orleans police officer Abreace Daniel sat in jail, the normally resilient fabric holding the Daniel family together was stretched to the breaking point. Booked in a rape in 2000 and suspected in another in 1994, Daniel, 38, was held in the maximum security wing of Orleans Parish Prison, unable to make his $360,000 bail and unwilling to let his parents borrow the money.

It wasn't until Daniel was cleared by DNA evidence in both cases that he was released. Even though the district attorney's office didn't formally refuse the charges until three weeks later, keeping Daniel out of work and under a cloud.

"It looks like they spent two months trying to pound a square peg into a round hole," said Daniel's attorney, Willard Hill. "Even when it became obvious that they were mistaken, they (police officials) had no announcement whatsoever. They just quietly slinked off. That, to me, is the real crime. They didn't give him any of his dignity back."

### Not again

For Daniel, it wasn't just a nightmare. It was a nightmare revisited.

Eight years ago, in a completely unrelated 1995 case, Daniel was accused of coercing a drunken Tulane student into performing oral sex on him in his patrol car. The case was shaky and the woman's story was full of holes, but Daniel was put on trial anyway. A jury deliberated for less than half an hour before finding him not guilty. He returned to work and quickly regained his footing among his fellow cops. Before long he was serving as the 1st District quality-of-life officer, a high-profile position for which he was handpicked by Superintendent Eddie Compass, who was then the district commander.

At home, however, Daniel and his wife, Zina, had not completely recovered. They still had old legal bills to pay. A wrongful arrest lawsuit, stalled in the courts, had cast a pall over Daniel's relationship with top-level police brass.

The psychological scars were healing, though, and Jardyn's birth in October 2000 seemed to breathe fresh air into their home life.

Then, on the morning of July 23, the family's recovery was dealt a crippling blow. During roll call, Daniel was called into the office of his 7th District commander, Capt Timothy Bayard. Daniel, a field training officer who was mentoring a recruit, thought Bayard must be giving him a special assignment. Instead, he found himself face-to-face with sex crimes detective Sgt. Michael Bossetta, who told him he was under investigation for "adherence to law." Officers

are routinely investigated for matters large and small, so it wasn't until Daniel was driven to the Public Integrity Bureau and read his rights that he realized the gravity of the situation.

"I'm reading my arrest warrant, and I see aggravated rape, attempted first-degree murder, aggravated battery, kidnapping. At first I thought it must be some type of elaborate joke," Daniel said. "But once the crime lab people walked in, I knew it was serious. Right away, I got sick to my stomach. I started wondering if my family could go through this again."

Based on Daniel's resemblance to a composite sketch—and the victim's subsequent identification of the officer's photograph, the 13-year veteran officer was accused of kidnapping, beating and raping a Florida tourist in Sept. 2000. As soon as Daniel was arrested, detectives were searching his house and car, scraping DNA material from the inside of his cheek, parading him to jail in front of television cameras and turning his life upside down. Again.

"I wasn't worried about the evidence, because I knew they couldn't have any," Daniel said. "But I was worried about my family. So I begged them: Don't arrest me until you do the DNA test. Don't put my family through this again. Not even (suspected serial rapist and killer) Derrick Todd Lee was named until they matched his DNA. If that's their parish, state and federal agencies are willing to wait for the DNA test before they put out a warrant for Lee, why couldn't the NOPD wait before they arrested me?"

### Drawing suspicion

The Police Department was tight-lipped about the case. Compass, who held a news conference as Daniel was being booked, did not return several calls for comment. In a news release, the department said it "stands by its decision" to arrest Daniel.

"The case was presented to two state magistrate judges, and it was declared there was, in fact, sufficient 'probable cause' by investigators to have Daniel taken into custody," the release says. As for whether the DNA tests could have been done faster, the department's arrest, police officials refused to comment: "Because there is an anticipation of future legal proceedings, to discuss the results or the testing process of DNA samples collected in the case would be inappropriate and premature."

The evidence that led to Daniel's arrest, however, was hardly straightforward In the 2000 case, the victim, a 31-year-old visitor from Florida, met her attacker in a French Quarter bar. He offered to drive her to her hotel, and she agreed. In the car, a Pontiac Bonneville, the man hit the woman over the head with a metal object, drove her to a remote section of the

Florida public housing complex, violently raped her and left her for dead.

In the 10-page application for Daniel's arrest warrant, Bossetta wrote that he revisited the case after a patrolman, citywide task force officer Ronald White, came to the rape squad with a tip: He saw a man fitting the rapist's description behind the wheel of a Bonneville. But instead of pursuing White's lead, Bossetta turned his attention to Daniel.

"Sgt. Bossetta found the circumstances of the officer's information and inquiry odd in that the case was three years old and no new information had been disseminated since that time," Bossetta wrote, noting that the last time an officer made a suspicious inquiry about an unsolved rape was in 1994. That officer: Abreace Daniel, who quickly became the "main suspect" in that 1994 case, according to the affidavit. Under Bossetta's theory, White approached the rape squad with the tip to take attention away from Daniel.

Based on that, Bossetta compared the 1994 and 2000 cases and found "some striking similarities," he wrote. Aside from similar descriptions of the attacker that resembled Daniel — a tall black male with a shaved head and muscular "football" build — the most glaring common element was this: In each case, the attacker forced the victim to remove one shoe and kept the other shoe as a trophy

Armed with that information, Bossetta found the victim in the 2000 case and showed her some photographic lineups, according to the warrant application. In a black and white lineup, the victim tentatively picked out Daniel. In a color version, she grew more certain, pointing at Daniel's photo and commenting, "Yep, this picture is really affecting me."

Contacted at her home in Florida, the victim stood by her identification, despite the fact that Daniel was cleared through DNA testing. The woman noted that a friend, who was with her at the bar when she met the attacker, also picked Daniel out of a lineup In the warrant application, however, Bossetta said the friend didn't pick Daniel out of the black and white lineup and could list Daniel only as a "very possible" suspect in the color lineup.

"It all could have been avoided if they would have waited to get the DNA," Daniel said. "I guess they needed to put me on the news to take the heat off the rising crime rate. I guess they thought they could discredit me to keep me from pressing my lawsuit from the '95 arrest. I can't prove any of that, but that's what I believe."

### 'The cop in the cage'

Daniel said Bossetta ignored dozens of reasons pointing to his innocence The composite sketch shows a clean-shaven

man with arched eyebrows; Daniel has a mustache and flat eyebrows. The victim described the rapist's voice as "soft and almost feminine"; Daniel speaks in a congested baritone. The rapist drove a Bonneville; Daniel drives a Firebird Trans-Am. Furthermore, the search of Daniel's home and car didn't turn up any "trophy" shoes or clothing similar to the black polo shirt worn by the attacker.

As for Daniel's character, his arrest record is filled with commendations and blemished by only one disciplinary action: a three-day suspension in 1997 for failing to confiscate a stolen bicycle as evidence. Bayard said he vouched for Daniel's character, but to no avail.

"I couldn't believe they were doing it," Bayard said. "I never had a question in my mind about Abreace. Never. I can tell you, it caused a big morale problem around here, because we all knew he was innocent. But they took a hard line on the kid, and it blew up in their face."

Daniel said detectives didn't even ask him for an alibi If they had, he would have told them that at the time of the rape his wife was eight months pregnant, his mother was staying at their home awaiting a leg amputation and, within the same two-hour window of the rape, he was at a police roll call to begin his 7 a.m shift.

"To this day, nobody has ever asked me where I was on this date at that time," Daniel said. "It just shows that they targeted me because I had been accused before."

With his family thrown into chaos, Daniel endured his own private hell inside parish prison. Because of the serious charges against him and his status as a cop, Daniel was placed on 23-hour lockdown in a one-man cell. The bad food and stench from lack of air conditioning took away his appetite, causing him to lose 30 pounds from his 250-pound frame Each of the three times he went to court for hearings, he was the only inmate in shackles.

"Anger would come and go. Humiliation was a constant," Daniel said. "All kinds of deputies would come over and point. One deputy pulled me out of the cell to take a picture. It was like a constant parade of people coming to look at the cop in the cage."

Zina said that when she visited her husband, "I cried from the moment I sat on the stool until I left. I couldn't believe the humiliation."

Hill said he saw his client grow more frustrated with each passing week. "He was clearly getting agitated about why it was taking so long to get the DNA tests back. He knew what the results would be. He just couldn't understand what was taking so long. I couldn't understand either. The low point was when Abreace missed his baby's first day of school. He constantly mentioned that during

our visits Now it's lost for...

### Stained

Daniel was locked up days. He was released / when the district attorney's office released DNA test excluding him as a susp criminal court judge to state. Had Daniel's bail tion, but prosecutors did mally refuse the charge Sept. 16. Even with the ision the refusal wasn't part of the court recor Sept. 23, forcing Daniel another week without check.

Daniel said his home brought more relief th The family went to Dest for a weekend to celebr ing to make up for the summer vacation the Kristoffer and Brande ually returned to their school rhythms, and Jar gan sleeping through th again.

But for Daniel, the wa family life has been ov owed by the wreckage past two months. His forced him to hire a ban attorney The jobs he supplement his police sa working on performan and breeding dogs — d in his absence. He retu work, but not in uniform, easing him back into t dle," Bayard said.

Daniel said his colle the 7th District have be portive, but he still gets when he sees a patrol up behind him or runs in ice officer he doesn't kno

"Every time I hear t lice) radio, I think, 'W they want with me now? ways want to make sure on the right path and d right thing, but now it's always second-guessing Is this right? Is that rig sort of like walking on shells."

Worst of all, Daniel the taint that a rape acc leaves behind

"It's like a stain that washed away," Daniel r you're cleared in a shoot killing, it's over with you're accused of a sex especially more than stays with you People you funny. How do you the pain and humiliati answer is, you can't."

Daniel said he has no from Compass. Bosset one else involved in the cept for two Public Int Bureau officers who su him a few days after turned to work. Going book of departm guidelines, they took statement about the rap termine if he committed ministrative violations.

*     *     *     *     *     *     *

Michael Perlstein can be reach mperlstein@timespicayune.com (504) 826-3316



# DEPARTMENT OF POLICE

*P.O. Box 51480*
*New Orleans, LA 70151*




**C. RAY NAGIN**
Mayor

**EDWIN P. COMPASS, III**
Superintendent of Police

July 7, 2004

OUR REF: 27051AA
PIB CASE #03-271C

P.O. Abreace Daniel
Seventh District

Dear Officer Daniel:

The allegations of misconduct made against you have been investigated.

As a result of that investigation, those allegations of misconduct have been classified as NOT SUSTAINED, that is, there is insufficient evidence to either prove or disprove the allegations made against you.

You are notified that documentation of this complaint will be entered in the Public Integrity Bureau computer file. Within 15 days of the date of this letter you will be afforded the opportunity to appear in the Public Integrity Bureau to review this documentation.

Sincerely,

EDWIN P. COMPASS III
Superintendent of Police

BY:    LONNIE H. SWAIN
Assistant Superintendent
Public Integrity Bureau

EPC/LHS/h

cc: PIB File Case

*An Equal Opportunity Employer*



PLAINTIFF'S EXHIBIT 8