UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**ZINA DANIEL ET AL.** | **CIVIL ACTION**

**VERSUS** | **NO: 04-2034**

**EDWIN P. COMPASS, III ET AL.** | **SECTION: "S" (4)**

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that the defendants' motion for summary judgment is **GRANTED**. (Document #13.)

**IT IS FURTHER ORDERED** that the defendants' motion to dismiss the state law claims is **GRANTED**. (Document #15.) The state law claims are **DISMISSED WITHOUT PREJUDICE** to Daniel's right to urge those claims in state court.

## I. BACKGROUND

On July 22, 2003, New Orleans Police Sergeant Michael J. Bossetta prepared a warrant application for the arrest of Officer Abreace L. Daniel. The application included Sergeant Bossetta's affidavit detailing the investigation into the aggravated rape and attempted murder of

Fee
Process
X Dktd
CtRmDep
Doc. No.

"LW" in the abandoned Florida Avenue Projects on September 12, 2000. Criminal Court Commissioner Harry E. Cantrelle signed the warrant for Officer Daniel's arrest. On July 23, 2003, Officer Abreace L. Daniel was arrested and charged with aggravated rape, attempted first degree murder, aggravated kidnaping and aggravated battery. Superintendent Edwin P. Compass, III held a news conference and issued a press release on behalf of the New Orleans Police Department.

After Officer Daniel's arrest, Magistrate Anthony J. Russo held a preliminary hearing and concluded that there was probable cause to hold Daniel on the charges, stating:

> Almost two hours of testimony, very thorough testimony , both on direct and cross by Officer Bossetta, who initially investigated this case and who followed up as a cold case several years later.
>
> The officer was very–he gave very detailed testimony and offered testimony, not only pertaining to this case, but also to a similar case, a 1994 case.
>
> Based on the testimony of this officer, again, without reiterating everything that he has said, the Court is going to find probable cause on the charge of aggravated rape against Abreace Daniel. The Court will find probable cause on the attempted first degree murder against Abreace Daniel. The Court will find probable cause on the aggravated kidnaping charge against Abreace Daniel, and the Court will find probable cause on the charge of aggravated battery against the defendant, Abreace Daniel.
>
> . . . .
>
> Well, the DNA is going to be the real telltale in this case. It could either, as the officer stated, make it or break it. But for a probable cause hearing, based upon the evidence presented by Officer Bossetta, there's–the Court feels there's sufficient evidence to hold the defendant at this time on those charges.

Exh. 5, Opposition Memorandum. After receiving a DNA report from a condom found near the scene, the District Attorney refused to prosecute because the DNA in the condom did not match Daniel's, and because the prosecutor found that the photographic identification was suggestive

and tentative.[1]  Officer Daniel was released, and the New Orleans Police Department reinstated him.

Zina Daniel and Officer Abreace L. Daniel, individually and as administrator of the estates of their minor children, Kristoffer Daniel, Branden Daniel, and Jardyn Daniel, filed a complaint for damages, pursuant to 42 U.S.C. § 1983, against Edwin P. Compass, III, individually and in his official capacity as Superintendent of the New Orleans Police Department; Lieutenant David Benelli, individually and in his official capacity as Commander of the New Orleans Police Department Sex Crimes Unit; Sergeant Michael Bossetta, Sr., individually and in his official capacity as a sergeant with the New Orleans Police Department

---

[1]  In a written memorandum providing the results from DNA testing on the evidence found at the crime scene, the prosecutor stated:
> Not one piece of evidence recovered from the scene had the D's DNA profile attached to it.  This, along with the totality of the evidence, is overwhelming evidence which convinces me that the State cannot prove beyond a reasonable doubt that the defendant assaulted this victim.
> 
> I spoke to Lt. David Benelli about the results this past Friday.  He was not surprised by the news.  He told me that the DNA results did not exclude the defendant because the condom in question came from someone else.  He explained this by stating that the presence of the V's blood and an unknown female's epithelial cell was found on the EXTERIOR of the condom. Additionally, the sperm cell recovered from the INTERIOR of the condom did NOT belong to the defendant.  Because of these factors, he opined that was a condom that was ALREADY on the scene when the defendant and the victim arrived at the crime scene.
> 
> While it is possible that Lt. Benelli is correct, the condom was located INCHES from the pool of blood where the V had been assaulted.  For that reason, the DNA test supports a theory that someone other than Abreace Daniels assaulted the victim.
> 
> Additionally, the V's identification of the defendant, via the photo line-up is, in my opinion, tainted and suggestive.

Exhibit 13, Opposition memorandum.

Sex Crimes Unit; and the City of New Orleans.

The complaint alleges the following claims under 42 U.S.C. § 1983: Superintendent Compass, Lieutenant Benelli, and Sergeant Bossetta violated Officer Daniel's right to be free from unconstitutional arrest, Superintendent Compass, Lieutenant Benelli, and Sergeant Bossetta are not entitled to qualified immunity, Sergeant Bossetta was inadequately trained to perform his duties as a sex crime investigator, and the approval of the warrant application by Superintendent Compass and Lieutenant Benelli is indicative of a policy of deliberate indifferent to the civil rights of the citizens of New Orleans. The complaint also alleges violations of state law under La. Civil Code arts. 2315 and 2315.6. Specifically, the plaintiffs allege claims of false arrest, malicious prosecution, defamation, intentional and negligent infliction of emotional distress, and trauma to Officer Daniel's wife and children as a result of the arrest.[2]

The defendants filed a motion to dismiss the § 1983 claims for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and an alternative motion for summary judgment, pursuant to Rule 56. Because the court considers matters outside of the pleadings, the motion is treated as a Rule 56 motion. See Rule 12(b). The defendants also filed a Rule 12(b)(1) motion to dismiss the supplemental state law claims for lack of subject matter jurisdiction.

## II. DISCUSSION

### A. Section 1983 claim: probable cause to obtain the arrest warrant

---

[2] At oral argument on the defendants' motions, the plaintiffs stated that they do not oppose the dismissal of the supplemental state law claims brought by Daniel's wife and children.

**1. Summary judgment standard**

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The nonmovant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**2. Official capacity claims**

Daniel alleges that the City of New Orleans and Superintendent Compass, Lieutenant Benelli, and Sergeant Bossetta in their official capacities, violated his rights under the Fourth Amendment.

A local governmental body is liable for damages under § 1983 for constitutional violations resulting from official city policy. See Monell v. Dep't of Soc. Serv., 98 S.Ct. 2018, 2035-36 (1978). A suit against Superintendent Compass and the officers in their official capacities is in essence a suit against the City of New Orleans. Woodard v. Andrus, 419 F.3d 348, 352 (5th Cir. 2005) (citing Monell, 98 S.Ct. at 2035 n.55. A municipality cannot be held vicariously liable under 1983 for the constitutional torts of its employees or agents. Monell, 98 S.Ct. at 2037. To establish liability for a constitutional violation against the City of New

Orleans, Daniel must demonstrate that the alleged constitutional offense is the policy or custom of the City of New Orleans. Woodard v. Andrus, 419 F.3d at 352. "[A] government's liability is not confined to laws or actions that have been given formal approval through an entity's policymaking channels. Id. A policy or custom becomes official for purposes of § 1983 when it results from the decision or acquiescence of the municipal officer or body with "final policymaking authority" over the subject matter of the offending policy. Gros v. City of Grand Prairie, 181 F.3d 613, 615 (5th Cir. 1999) (internal citations omitted). "Monell and later decisions reject municipal liability predicated on *respondeat superior*, because the text of section 1983 will not bear such a reading." Pitrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." Id. Thus, "a policymaker, an official policy and the 'moving force' of the policy are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." Id.

A careful reading of the complaint and memoranda indicates that Daniel does not specifically identify an ordinance, regulation, or a well-settled custom or policy in obtaining arrest warrants in violation of the Fourth Amendment. Absent an allegation of an ordinance, regulation, policy, custom or practice, Daniel can prove no set of facts in support of his Fourth Amendment claim which would entitle him to relief against the City of New Orleans or the superintendent and police officers in their official capacities.

**3. Individual capacity claims: qualified immunity**

Daniel alleges that Sergeant Bossetta obtained an arrest warrant without a showing of probable cause in violation of the Fourth Amendment and Lieutenant Benelli and Superintendent Compass approved the application for his arrest. The defendants argue that they are entitled to qualified immunity because the application for the arrest warrant establishes probable cause on its face, and Sergeant Bossetta obtained the warrant in good faith.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Goodson v. City of Corpus Christi, 202 F.3d 730, 735 (5th Cir. 2000). In a claim against the defendants in their individual capacities, the first step in examining a defense of qualified immunity asserted in a motion for summary judgment is to determine whether the plaintiff has alleged "the violation of a clearly established constitutional right." Siegert v. Gilley, 111 S.Ct. 1789 (1991). This court uses "currently applicable constitutional standards to make this assessment." Rankin v. Klevenhagen, 5 F.3d 103, 106 (5th Cir. 1993). "In terms of law being clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Goodson v. City of Corpus Christi, 202 F.3d at 736 (internal quotation and citation omitted).

The second step is to "decide whether the defendant's conduct was objectively reasonable" in light of the legal rules clearly established at the time of the incident. Spann v. Rainey, 987 F.2d 1110, 1114 (5th Cir. 1993). "Objective reasonableness is a matter of law for

the courts to decide." Goodson v. City of Corpus Christi, 202 F.3d at 736. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." Id. "Therefore, even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity." Id. (internal quotation and citation omitted). Id. "The plaintiff bears the burden of proving that a government official is not entitled to qualified immunity." Michalik v. Hermann, 422 F.3d 252, 258 (5th Cir. 2005).

The Supreme Court held in Malley v. Briggs, 106 S.Ct. 1092, 1098 (1986), that only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost. In order to prevail, Daniel "must demonstrate that a genuine issue of material fact exists as to whether the [officers] knowingly provided false information to secure the arrest warrants or gave false information in reckless disregard of the truth." Freeman v. County of Bexar, 210 F.3d 550, 553 (5th Cir. 2000). Further, Daniel "must demonstrate an issue of material fact as to whether any reasonably competent officer possessing the information that each officer had at the time he swore his affidavit could have concluded that a warrant should issue." Id. The court looks to the totality of the circumstances in making this decision. Id. The defendants are entitled to qualified immunity, even if officers of reasonable competence could disagree. Id. at 554.

**a. Superintendent Compass and Lieutenant Benelli**

As a preliminary matter, the court examines whether Superintendent Compass and Lieutenant Benelli are entitled to qualified immunity. Lieutenant Benelli testified in his

deposition that he was the commander of the sex crimes unit, and he worked with Sergeant Bossetta and others on the case. Benelli deposition at 22-23. However, under the rules and regulations of the New Orleans Police Department, the decision to conduct a criminal investigation and seek the arrest of a police officer was under the jurisdiction of the Public Integrity Bureau (PIB) and ultimately the Chief of Police. Id. at 81; see also exh. 10 at 236 ("it's not our jurisdiction, it's PIB's jurisdiction because he is an active police officer"). Thus, once it was determined that Officer Daniel was a target of the investigation, Sergeant Bossetta was acting as an agent for PIB. Id. at 82. Accordingly, although Lieutenant Benelli may have had a role in the investigation, he is not subject to liability because he was not the affiant on the warrant and was not responsible for its preparation or presentation. See Michalik v. Hermann, 422 F.3d at 261.

Further, Superintendent Compass is not subject to individual liability in this case. Supervisory officials are not liable for the actions of subordinates on a theory of vicarious liability. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). A supervisor will have personal liability only if he is personally involved in the constitutional deprivation, or if there is a sufficient causal connection between the supervisor's conduct and the violation. Id. at 304. The only allegations against Superintendent Compass states that he is generally responsible for the police department and that he held a news conference and issued a press release when Officer Daniel was arrested and charged. There are no allegations that Superintendent Compass, in his individual capacity, participated in obtaining the arrest warrant or negligently failed to prevent the application for the arrest warrant.

**b. Sergeant Bossetta**

Sergeant Bossetta prepared and signed the application for a warrant to arrest Daniel. Daniel has alleged a violation of a clearly established right under the Fourth Amendment of the constitution. See Malley v. Briggs, 106 S.Ct. at 1098. The court must examine the warrant application to determine whether a reasonably competent officer would have concluded that a warrant should issue under the totality of the circumstances on which Bossetta relied in securing the warrant.

The ten page warrant application included a narrative of the history of the investigation and a detailed description of the assailant and his automobile. See Exhibit 2, Opposition Memorandum. The renewed investigation of the almost three-year-old case began when Officer Ronald White went to the sex crimes section to provide information and to view the composite drawing of the suspect in the September 2000 case. Officer White reported that, while working a private detail, he observed a black male with a bald head driving a white Pontiac Bonneville and remembered a case with a suspect fitting a similar description.

Lieutenant Benelli and Sergeant Bossetta were curious about Officer White's inquiry into the case and interviewed him on June 19, 2003. The officers told Officer White that his explanation of interest was not plausible in light of the time factor and asked if he was withholding other information. Officer White became defensive and so belligerent that Sergeant Bossetta left the interview. Officer Gonzales overheard the "commotion" and recalled that a similar incident happened when Officer Daniel inquired about a 1994 rape case, in which he was a suspect. Officer Gonzales recalled that the 1994 case involved several police officers in the

First District and believed that Officer White was assigned to that district in 1994..

Sergeant Bossetta reviewed the 1994 case and discovered striking similarities between the 1994 case and the 2000 case: both of the victims were forced to remove one shoe, the victim was removed from a car and walked a short distance before the assault, both assaults occurred in abandoned areas next to grassy driveways and buildings with peaked roofs, the descriptions of the sexual assault and the assailants were similar, both victims were Caucasian with blonde hair, both victims were left stranded, police weapons were used in both assaults, and the assailant kept only one shoe.

On June 23, 2003 Sergeant Bossetta met with Detective Allen Gressett, a retired detective who had investigated the 1994 case. Detective Gressett examined the file and determined that there was a supplemental memorandum missing. He remembered that several police officers were suspected because the victim's cell phone was used by police officers for almost three months. Detective Gressett agreed to review his personal files for any additional documents.

Sergeant Bossetta then contacted Jim Hall, a retired lieutenant who was the commander of the rape squad in 1994, to inquire whether he remembered the case. Hall told Bossetta that no one was charged because the victim was "maced" four times and could not positively identify the assailant. Daniel was a suspect at the time because there were pictures of the assailant taken at an ATM machine where the victim was abducted and the victim had tentatively identified Daniel in a lineup.

No DNA sample was taken because the technology was not available to the police department in 1994. Sergeant Bossetta testified that he continues to suspect that Daniel is guilty

of the 1994 crime. On June 26, 2003, Sergeant Bossetta went to the police crime laboratory and met with Lieutenant David Skevington and Chief Criminalist Alan Sison. The officers reviewed the medical information and decided to order DNA testing on the 1994 samples to have the results available for future reference.

Sergeant Bossetta continued to be troubled by Officer White's interest in the 2000 case and discussed the matter with Sergeant Lorenzo. Sergeant Lorenzo remember the 1994 case and agreed that there were many "connections" between the 1994 and 2000 cases. Recalling the facts of the 1994 case, Lorenzo noted that Ivan Young, a maintenance man at the Carrollton Parc Apartments, found the victim's telephone in the bushes and turned it over to his supervisor, Mr. Washington. Washington gave it to the apartment manager, Ms. Kohn, who turned it over to Officer Ellis, who lived in one of the apartments. Officer Ellis kept and used the phone, and he was subsequently arrested for possession of the telephone. Few officers could afford cell phones in 1994, and even the Chiefs did not have them. Bossetta stated in his affidavit that he believed that the possession and use of the victim's cell phone gives rise to criminal intent. Further, Young lived at 3100 Gravier Street, and Officer White lived at 3225 Gravier Street. Sergeant Bossetta's theory was that Officer White had his neighbor turn the phone over to his superiors in order to create "two innocent veils of insulation . . . to protect the person(s) responsible for the rape of the victim, and/or the theft of her phone." Further, Sergeant Bossetta believed that, among the officers assigned to the First District in 1994, Officer White was the best candidate to request the composite drawing and try to get information in the 2000 case because he had no previous connection to the 1994 case.

Sergeant Bossetta supervised Detective Matthews in the investigation of the 2000 case. From the beginning of her involvement in the case, Sergeant Bossetta noticed that "her work effort and demeanor plummeted," and he had to conduct most of the investigation on the case.[3] He recalled that Detective Matthews' husband, Roland Matthews, was stationed in the First District in 1994 and was friends with all of the officers involved in the 1994 case. Detective Matthews was transferred to the patrol division because she failed to show any improvement. When Matthews failed to file a report in the 2000 case, Sergeant Bossetta attempted to contact her and learned that she had resigned from the department.

On July 15, 2003, Sergeant Bossetta and Detective Michael McCleery traveled to Navarre Beach, Florida to re-interview "LW" and Ms. Tuttle, the victim's companion on the night of the

---

[3] In his deposition, Sergeant Bossetta was more specific about Detective Matthews' conduct. Exh. 3 at 20, Opposition memorandum. Sergeant Bossetta testified that, while he, Detective Gressett, and Detective Matthews were investigating the crime scene, Detective Gressett told him "I don't know what is wrong with Cheryl, but she just got a phone call and she went and sat in the car and she hadn't come out since and she is obviously upset." Id. Sergeant Bossetta went to the car and asked her if she was okay, and she shook her head indicating "yes." Sergeant Bossetta suggested that Detective Matthews go back to the office and take a break because it was a hot day, there was a tremendous amount of blood at the crime scene, and he thought the circumstances of the crime were upsetting to her. Id. at 20-21. Sergeant Bossetta went to the hospital to interview the victim and learned that she had met the assailant at Johnny White's Bar on Bourbon Street. Id. at 22. Sergeant Bossetta instructed Detective Matthews to go to the bar right away to obtain the surveillance tape. Id. at 26. Later that evening when Sergeant Bossetta asked for the tape, Detective Matthews told him she was too busy doing other things and had not gone to the bar. Id. Sergeant Bossetta went to the bar, but the "revolving tape" had been erased by then. Id. at 27. Other aspects of Detective Matthews' investigation were unsatisfactory. Exh. 10 at 210. For example, a record of the original call was missing from the file, and Detective Matthews did not follow up on a suspect who had rented a Pontiac Bonneville. Id. Sergeant Bossetta had to go to Baton Rouge himself to serve the subpoena to get the information. Id. Sergeant Bossetta wanted to discipline Detective Matthews, but Lieutenant Benelli decided to counsel her because she was having personal problems. Id. at 211.

incident. Tuttle told the officers that she could identify the person she saw with the victim at Johnny White's Bar. At approximately 4:00 a.m., "a black male, wearing a black 'Polo' style shirt came in the bar and began 'hitting on' her friend." The man, who called himself Byron, invited them to celebrate his birthday at Harrah's casino, but Tuttle told him no bluntly and somewhat rudely and tried to get him to leave them alone. The victim apologized for Tuttle's behavior and befriended "Byron." Tuttle went to the ladies room, and when she returned, the bartender told her that her friend had left with "Byron" in a white car. Tuttle looked for her at their hotel and at Harrah's Casino, and reported her missing when she could not find her. The next morning she learned what had happened to her friend.

Detective McCleery showed Tuttle a photographic lineup that did not include Daniel. She identified the picture of Byron Glapion, who McCleery considered a possible suspect, as a "maybe." She signed the back of the photograph and wrote "maybe." Tuttle examined a second photographic line-up that included Daniel, but could not decide between his photo and that of another suspect. In a third line-up containing colored photographs, Tuttle immediately pointed to Daniel and exclaimed "Oh my, this one is very possibly the guy." She signed the back of Daniel's photo and added "very possible."[4]

---

[4] In his deposition, Sergeant Bosetta stated that only one "suspect" appeared in the photographic lineups that included Daniel, and all of the other "fill-ins" were different. Exh. 3 at 90, Opposition Memorandum. Sergeant Bosetta testified that he explained the procedure to the victim as follows: "All I'm asking you to do is view these photographs and indicate if the person you see is the person most familiar to you involving this incident. If you see that person in the lineup indicate that to me. That's what I said. And that's what is on that warrant, in my opinion. I didn't tell her what to say." Id. at 94. Sergeant Bosetta could not remember exactly what the victim said; however, he stated that "she eliminated these other five people and indicated this

The following morning, the officers met with "LW". She advised that she was still recovering from the incident but that she was very committed to the investigation. The victim described "Byron" as a black male, 6'2" tall, 230 to 240 pounds, broad shoulders, manicured nails, and a balding head. Further, she described his voice as soft and his eyes and brows as "looking feminine." She related how they met at the bar, and "Byron" asked her to go celebrate with him. She stated that, when Tuttle went to the ladies room, "Byron" told her that Tuttle agreed that he should drive them back to their hotel. He told the victim to get into the car because he had to move it around the corner because the street sweepers were coming. The victim was intoxicated, and "Byron" pulled her into the car. The victim realized that "Byron" was not taking her to the hotel and asked where he was going. "Byron" struck her, knocked her head against the passenger window, and threatened her. "Byron" hit her several times as they drove, then stopped before a large chain-link gate.

After opening the gate, he drove into an apartment complex that "looked like a ghetto." "Byron" dragged the victim by the hair and told her to take off one shoe and place it on the ground. As she bent over to remove her shoe, "LW" punched him in the groin in a effort to escape. "Byron" beat her, pulled her hair, and choked her while laughing and shouting "why

---

picture, this suspect to be the person who was most familiar to her concerning that incident, as the person who raped her." Id. at 100. Sergeant Bosetta testified that he told the victim to sign the reverse side of the photo and indicate the number of the photo and the date. Id. at 98. After she identified the colored photograph in the third line-up, the victim asked Sergeant Bosetta if she had a larger photograph of the suspect she had selected, similar to the size of the photograph of Glapion in the first lineup. Id. at 105-06. Sergeant Bosetta "had a bigger picture like the other ones . . . [and] showed it to her after it was already over with." Id. at 106.

won't you die?" The victim pretended she was dead as she passed in and out of consciousness. As she watched "Byron," she realized that she was nude, and he was rubbing against her, but was unable to perform sexually. Eventually, he left her for dead, yelling "I'm going to think of your dead ass at my birthday dinner with my wife and kid." The victim was able to walk out of the vacant housing project, and a neighbor saw her and called the police. The victim woke up in the emergency room covered in blood.

During the interview, the officers showed "LW" the same three photographic lineups they had shown to Tuttle. The victim did not identify anyone in the first lineup, but "tapped" Daniel's picture in the second lineup, stating that he looked "the most familiar." In the third lineup, the victim pointed to Daniel's picture as the most familiar. She alternated between sweating and feeling chilled and stated that the photo was affecting her. She asked for a larger photo of Daniel and nodded several times "I really think that's him, he even looks like the composite should have looked."

The victim asked to see the crime scene photographs. When the officers questioned her about bite marks on her breast, she stated that she was not bitten but poked with some sort of instrument. She was surprised that she had not remembered the cylinder shaped, black and silver stick before. The victim described the instrument as follows: "the end felt like a small triangle that was metal like a meat-tenderizing tool and it 'rattled' as if it were full of quarters or change. . . . [O]ne end was silver and hard and the other end was black like rubber." Sergeant Bossetta realized that the victim was describing a police expandable baton, or asp.

On July 18, 2003, the decision was made to pursue a warrant to arrest Daniel, and

Sergeant Bossetta's ten-page affidavit in support of probable clause included the following statement:

> Sergeant Bossetta, having thoroughly investigated this matter, wherein the availability of the DNA technology exists and the concomitant evidence within both matters are congruent to with the modus operandi, the corpus delecti, and the suspects description and consequent identification by the victim and witnesses in these cases strongly suggest that probable cause exists. The DNA technology processed and profiled by and within the capacity of the New Orleans Police Department shall facilitate the most un-bias, accurate, and precise means to serve Justice blindly with regard to the elimination and/or incrimination of the suspect named herein. The undersigned affiant prays and shall truthfully swear to that the aforementioned facts and circumstances are true and merit the issuance of this warrant according to law.

Daniel contends that there is a discrepancy between the victim's deposition testimony concerning her missing shoe and Sergeant Bosetta's representation in the application and affidavit (stating that the 1994 and 2000 assaults were similar because the assailant took one of the victim's shoes). Daniel argues that the arrest warrant application was based on statements made by the victim in 2003, when her memory of the incident was less accurate.

In her deposition, the victim did not state that the assailant told her to take off one shoe. She testified that she had only one shoe on her foot because she left one shoe outside when she attempted to run: "I lost one shoe when I went to run, the last time that I saw a chance to run, which was–I was drug out of the car and into the building, right inside the door there is another door to go into a room, and he was, at this point, really concerned for time and staring at his watch a lot." Exh. 4 at 63, 68 Opposition memorandum. She stated that "[w]hen he came at me the first time to try to rape me, I took that shoe and I nailed him as hard as I could, as close to his groin area as I could, and I am not positive that I hit it." Id. The assailant then took the shoe

away from her "and beat [her] in the back of the head with it over and over and over and over." Id. at 71.

Although the victim gave a version of the loss of the shoe in her deposition that is different from the information in the arrest warrant application, Daniel neither alleges nor presents evidence that the victim related this version of the facts surrounding the shoe to Sergeant Bossetta before he filed the application and affidavit. Accordingly, Daniel does not demonstrate that there is a genuine issue of material fact as to whether Sergeant Bossetta knowingly provided false information or recklessly disregarded the truth in order to secure the arrest warrant.

Daniel also challenges the suggestiveness of the identification procedure, resulting in a substantial risk of misidentification. He contends that the victim's initial identification of her assailant was vague. Further, Daniel contends that the victim was not clear in her identification and even identified a New Orleans football player as her assailant.

Daniel's argument addresses the prosecutor's concerns about the suggestiveness of the lineup, based on the use of black and white photographs in one lineup and colored photographs in another, the use of different "fill-ins" in the three photographic lineups, and the prosecutor's refusal to pursue the case. However, Daniel does not demonstrate that there is a genuine issue of material fact as to whether Sergeant Bossetta knowingly prepared a flawed photographic lineup and knowingly or recklessly presented the information to the Criminal Court Commissioner in order to secure the arrest warrant.

Daniel contends that Sergeant Bossetta knew that the victim had been hypnotized and had recovered memories, but did not include the information in his affidavit or in his testimony at the

preliminary hearing. Daniel's conclusory argument does not identify further information that would create a genuine issue of material fact as to whether Sergeant Bossetta knowingly provided false information.

After a careful review of the evidence and considering the totality of the circumstances, the court concludes that Sergeant Bossetta's request for an arrest warrant was not so lacking in indicia of probable cause as to render it outside the range of the professional competence expected of an officer. Daniel fit the victim's physical description of the assailant, and both the victim and her friend tentatively identified him as the man they met in the bar. Daniel remained a suspect in another rape case that had some similarities to the 2000 case. The facts and circumstances within Sergeant Bossetta's knowledge were sufficient to support a reasonable officer's belief that there was probable cause to conclude that Daniel had committed the offense and to seek a warrant. Therefore, Sergeant Bossetta is entitled to qualified immunity from suit.

Accordingly, there are no genuine issues of material fact, and the defendants are entitled to judgment as a matter of law on the Fourth Amendment claim under § 1983.

**B. Supplemental jurisdiction over claims under Louisiana law**

Daniel invokes the court's supplemental jurisdiction under Louisiana Civil Code arts. 2315 and 2315.6. "A district court may decline to exercise jurisdiction if it has dismissed all the claims over which it had original jurisdiction." Priester v. Lowndes County, 354 F.3d 414, 425 (5th Cir. 2004); 28 U.S.C. § 1367(c)(3). In this case, the court has dismissed the § 1983 claims and declines to exercise supplemental jurisdiction over the state law claims. The state law claims

are dismissed without prejudice to Daniel's right to reurge them in state court.

New Orleans, Louisiana, this 14 day of November, 2005.

MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE